2012 CO 42

**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

**v.**

**Andrian ARAPU, Defendant–Appellee.**

**No. 11SA326.**

Supreme Court of Colorado,
En Banc.

June 4, 2012.

Martin C. Beeson, District Attorney, Ninth Judicial District Arnold P. Mordkin, Chief Deputy District Attorney, Aspen, Colorado, Attorneys for Plaintiff–Appellant.

John Van Ness, Kathy Goudy, Carbondale, Colorado, Attorneys for Defendant–Appellee.

Justice EID delivered the Opinion of the Court.

¶ 1 The prosecution brings this interlocutory appeal pursuant to section 16–12–102(2), C.R.S. (2011), and C.A.R. 4.1(a) seeking to reverse the trial court's ruling suppressing evidence obtained from the search of the apartment of the defendant, Andrian Arapu.

¶ 2 Federal Immigration and Customs Enforcement ("ICE") agents sought to contact Arapu, suspecting he was in the country illegally. In accordance with their standard protocol, ICE requested assistance from local law enforcement, in this case, the Aspen Police Department ("APD"). Detective Chi was among the APD officers providing assistance. When federal agents contacted Arapu, he refused to give them permission to enter his apartment, but he consented to Detective Chi entering the apartment to monitor a woman already inside. When the federal agents were arresting Arapu, he gave

his consent to Detective Chi to gather his keys and phones, and to secure the apartment.

¶ 3 The woman asked to leave the apartment so that she could go to work, and Detective Chi, while still in the apartment, asked for her name, date of birth, and identification. When she could not provide identification, one federal agent entered the apartment to question her. At this point, another APD officer entered the apartment, observed a firearm, and alerted those present of her discovery. Other federal agents then entered the apartment to take pictures of the firearm. When the federal agents had finished their investigation, some twenty-five minutes after Arapu's arrest, Detective Chi gathered Arapu's keys and phones in preparation to leave and lock up the apartment. In the process, Detective Chi observed an open bag on the floor that appeared to contain cocaine. Soon thereafter, Detective Chi prepared an affidavit in support of a search warrant. The firearm and the drug-related evidence were seized in connection with the execution of the search warrant.

¶ 4 Arapu moved to suppress the evidence. The trial court granted the motion, ruling that Detective Chi had exceeded the scope of Arapu's consent by (1) asking the woman for identification while they were both still in the apartment, and (2) by remaining in the apartment while the federal agents conducted their investigation. The court concluded that because Detective Chi was in the apartment unlawfully when he observed the open bag and the firearm, any information regarding those observations had to be excised from the affidavit supporting the search warrant, which in turn rendered the warrant unsupported by probable cause.

¶ 5 We now reverse. We find that Arapu consented to Detective Chi's presence in his apartment to monitor the woman inside, and that such consent would reasonably include asking her for identifying information. Similarly, we find that Arapu consented to Detective Chi remaining in the apartment to gather Arapu's keys and phones, and to secure the apartment, and such consent would reasonably include remaining in the apartment until the federal agents had left. We, ac-

cordingly, find that the trial court erred in finding Detective Chi was unlawfully in the apartment when he observed the open bag containing drugs, and therefore reverse the trial court's suppression of the drug-related evidence. Because the prosecution concedes in its briefing to us that the discovery of the firearm was unlawful, we determine whether the affidavit would support a finding of probable cause if the firearm portions were excised, but with the observation of the open bag containing drugs included. We hold that it does, and that the firearm would have been discovered in a search pursuant to the redacted affidavit. We therefore reverse the suppression order with regard to the firearm as well.

## I.

¶ 6 The prosecution charged Arapu with possessing a controlled substance, intending to distribute a controlled substance, inducing another person to distribute a controlled substance, and possessing a deadly weapon while committing the controlled substance crimes. Arapu claimed the police illegally entered his home, and he sought to suppress all observations made and evidence obtained at his apartment. At the suppression hearing, the trial court found the following facts based on testimony of three law enforcement officers, a woman in Arapu's apartment at the time of his arrest, and Arapu.

¶ 7 On April 6, 2011, ICE Special Agents Carter, Hipps, and Turza sought to contact Arapu. ICE suspected Arapu was in the country unlawfully and intended to arrest him without a warrant. ICE agents typically request assistance from local law enforcement for safety purposes when contacting local residents, and, in this case, the APD provided Detective Chi, Officer Ward, and Officer Olson.

¶ 8 Arapu answered his door when Agent Carter knocked, but he refused to let any law enforcement officers enter his apartment. Arapu and Agent Carter talked outside of the apartment for several minutes before Agent Carter asked permission to retrieve Arapu's immigration documents from inside the apartment. Arapu refused

Agent Carter's request, but suggested that a woman named Elena Inozemtseva—who, unbeknownst to Agent Carter, was currently inside the apartment—could retrieve the immigration documents. Perceiving a risk to officer safety, Agent Carter immediately informed Arapu that "either we go in or she comes out." In response, Arapu invited Detective Chi into his apartment, apparently because Arapu knew Detective Chi from a prior incident where Detective Chi treated him fairly.

¶ 9 The conversation between Arapu and Agent Carter continued, with Agent Carter outside the apartment, Arapu just inside the apartment, and Detective Chi further inside the apartment. Agent Carter asked Arapu if there were weapons in the apartment, and Arapu admitted that an air pistol was located in the kitchen. Detective Chi asked Arapu if he could pick up the air pistol, which he did, confirming that it was an air pistol. At this point, Detective Chi observed a fifty-round box of .38 caliber Remington ammunition, suggesting there might be a handgun in the apartment.

¶ 10 Approximately fifteen to twenty minutes after knocking on Arapu's door, Agent Carter took Arapu into custody. Arapu faced the apartment and asked Inozemtseva for his keys and phones while Agent Carter handcuffed him. Detective Chi then offered to bring Arapu's keys and phones to him, and to secure the apartment. Arapu replied "thanks" or "ok" in response to Detective Chi's invitation. Arapu did not ask Detective Chi to leave at that time, or place any temporal limitation on the amount of time Detective Chi could remain in the apartment.

¶ 11 Detective Chi remained inside the apartment immediately after Arapu's arrest. Inozemtseva indicated she needed to leave for work, but before she left, Detective Chi asked for her name, date of birth, and identification. Detective Chi relayed this information to Agent Hipps, who then entered the apartment to question Inozemtseva for ap-

proximately four to nine minutes before deciding to take Inozemtseva into custody because she concluded that Inozemtseva was unlawfully present in the country. The entire exchange between Detective Chi, Agent Hipps, and Inozemtseva lasted between five to ten minutes.

¶ 12 While Inozemtseva was being handcuffed, Officer Olson stepped inside the apartment. She immediately directed Detective Chi's attention to a firearm partially covered by a hat on a shelf next to the apartment door where Arapu had been standing while he spoke with Agent Carter. Then, Agents Carter and Turza entered the apartment to take pictures of the firearm and spoke about whether the state or federal government would prosecute Arapu. About the same time—that is, approximately five to ten minutes after Arapu was arrested—Detective Chi gathered Arapu's keys and phones, and, while preparing to leave and secure the unit, he noticed an open bag under the coffee table on the floor. The bag appeared to contain drugs and drug paraphernalia. The drugs appeared to be cocaine.[1]

¶ 13 Detective Chi obtained a search warrant for Arapu's apartment later that day. During the search, law enforcement seized 39.9 grams of cocaine, a loaded .38 caliber revolver, multiple plastic baggies (including some with residue), a scale, screens and grinding equipment, baggies and bottles containing suspected marijuana, and co-mingled prescription drugs in an unlabeled plastic bottle.

¶ 14 Arapu moved to suppress all of the evidence. The trial court granted the suppression motion, suppressing the firearm and drug-related evidence. In its written order, the trial court concluded the prosecution proved Arapu "invited" Detective Chi into his apartment, and that Arapu voluntarily accepted Detective Chi's offer to take his keys and phones, and to secure the apartment.

---

1. According to Detective Chi's affidavit, he saw: an open blue bag which contained a large block of a white powdery substance. The substance was in a clear plastic bag and appeared to your Affiant to be in excess of 4 grams. Through your Affiant[']s experience and train-

ing the substance is believed to be Cocaine. Your Affiant observed, sticking up in the blue bag, small 3/4″ × 3/4″ baggies, which your Affiant knows to be used in the packaging for sales of controlled substances like Cocaine.

Addressing the breadth of Arapu's consent under *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the trial court then concluded that Detective Chi had exceeded the scope of Arapu's consent by asking Inozemtseva for identification and by remaining in the apartment while the federal agents conducted their investigation. Because Detective Chi exceeded the scope of Arapu's consent, the trial court concluded he was not lawfully present in the apartment when he saw the cocaine and the firearm under the hat.

¶ 15 The prosecution then filed this interlocutory appeal, and we now reverse.

## II.

■ ¶ 16 The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution presume that searches and seizures inside a home without a warrant are unreasonable. *Payton v. New York*, 445 U.S. 573, 585–87, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *People v. O'Hearn*, 931 P.2d 1168, 1172–73 (Colo. 1997). Absent an exception to the warrant requirement, the threshold of the home may not be crossed without a warrant. *Payton*, 445 U.S. at 590, 100 S.Ct. 1371; *People v. Aarness*, 150 P.3d 1271, 1277 (Colo.2006). One exception to the warrant requirement is consent, which may include express or implied limitations. *People v. Torand*, 622 P.2d 562, 565–66 (Colo.1981) (when a consenting person permits officers to search a home for specific items, officers exceed the scope of consent if they continue to search after finding those items). The test for determining whether an officer has exceeded the scope of an individual's consent to enter a home is "that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801.

■ ¶ 17 Review of a trial court's order on the scope of a suspect's consent to search is a mixed question of fact and law. *People v. Minor*, 222 P.3d 952, 955 (Colo.2010). We review the trial court's factual determinations for clear error. *Id.* Conversely, we review legal questions de novo, including the

question of "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quoting *Jimeno*).

¶ 18 The trial court concluded that Detective Chi exceeded the scope of Arapu's consent both in regard to the discovery of the open bag containing drugs and the firearm. We first consider the trial court's suppression of the drug-related evidence, and then turn to the suppression of the firearm.

### A.

¶ 19 The trial court found that Detective Chi was unlawfully in the apartment when he observed the open bag containing what appeared to be cocaine because he had exceeded the scope of Arapu's consent in two different ways. First, the court found that Detective Chi exceeded the scope by asking Inozemtseva for identification while they were still in the apartment. Second, the court found that he exceeded the scope by remaining in the apartment while federal agents questioned Inozemtseva and observed and took pictures of the firearm under the hat.

¶ 20 Initially, Arapu consented to Detective Chi's presence in the apartment to monitor the activities of Inozemtseva and to ensure she did not threaten officer safety. As the trial court put it, Arapu "invit[ed] him in." Later, when it became clear that Arapu was to be taken into custody, he gave his consent to Detective Chi to remain in the apartment to gather his keys and phones, and to secure the premises. Arapu did not limit the amount of time Detective Chi could remain in the apartment.

■ ¶ 21 The trial court determined that Detective Chi first exceeded this consent because, when Inozemtseva asked if she could leave the apartment to go to work, Detective Chi asked her for her name, date of birth, and identification while they were still inside the apartment. According to the trial court, Detective Chi was required to step outside with Inozemtseva to ask her for this information. We disagree. Arapu had consented to Detective Chi's presence in the apartment to

monitor Inozemtseva, and that was exactly what he was doing in asking for her name, date of birth, and identification before she left. Detective Chi testified that he always asks for identifying information from a potential witness, such as Inozemtseva, and the trial court determined this is generally a reasonable police practice. We therefore conclude that a reasonable person would have understood Arapu's consent to monitor Inozemtseva in the apartment to include asking her for identifying information, and disagree with the trial court's conclusion to the contrary.

¶ 22 Next, the trial court determined that Detective Chi exceeded Arapu's consent by remaining in the apartment while Agent Hipps questioned Inozemtseva and then by remaining in the apartment while other federal agents observed and took pictures of the firearm under the hat.[2] Again, we disagree with the trial court's conclusion.

¶ 23 The trial court reasoned that Detective Chi should not have remained in the apartment while the federal agents were inside the apartment conducting their investigation. The trial court's order implies that he should have left the apartment during this time. But Arapu consented to Detective Chi remaining in the apartment to gather his keys and phones, and to secure the apartment. As noted above, Arapu placed no temporal limitation on this consent. We conclude that a reasonable person would have understood consent to secure the apartment as consent to remain in the apartment until everyone had left, at which time securing the apartment would be possible. Thus, we disagree with the trial court's conclusion that Detective Chi exceeded the scope of consent by waiting for the federal agents to leave before securing the apartment.

¶ 24 Ultimately, the trial court found that, because Detective Chi was in the apartment unlawfully at the time he observed the open bag containing drugs, the drug evidence had to be suppressed. Significantly, however, the trial court made no finding that the fact that Detective Chi remained in the apartment to ask Inozemtseva for identifying information and remained while the federal agents were conducting their investigation enabled Detective Chi to see the bag containing drugs. Nor did the trial court make a finding that Detective Chi extended his stay in order to obtain evidence. On the contrary, the trial court found that Detective Chi did not use this time to search for evidence but rather to ensure officer safety. In fact, as the trial court found, after gathering the keys and phones, when Detective Chi was ready to leave and lock up, he "looked down and saw an open black bag under the coffee table on the floor," which appeared to "contain drugs and drug paraphernalia."

¶ 25 Because Detective Chi was lawfully inside the apartment while he prepared to leave the apartment, under the circumstances, the trial court erred in its conclusion that information contained in the affidavit regarding the open bag must be excised and could not be considered in determining probable cause.

### B.

¶ 26 We now turn to the trial court's conclusion that evidence of the firearm should be suppressed. In its briefing to us, the prosecution concedes that Officer Olson observed the firearm after illegally entering Arapu's apartment, and that therefore the portions of the affidavit relating to the firearm cannot be considered in determining whether probable cause existed for the search. The first question before us, then, is whether the affidavit established probable cause to search the apartment with the firearm portions stricken, but the observation of the open bag containing drugs included. Because our review of a redacted affidavit is de

---

2. We note that at one point in its opinion the trial court also seemed to fault Detective Chi for permitting the federal agents to conduct their investigation in the apartment. We are aware of no authority, and none has been brought to our attention, that would impose an obligation upon, or give authority to, a municipal law enforcement officer to direct how a federal investigation should be conducted. However, we need not address this issue because the trial court ultimately based its suppression order on the fact that Detective Chi, in addition to asking Inozemtseva for identifying information while both were still in the apartment, remained in the apartment while the federal agents conducted their investigation.

novo, *People v. Hebert,* 46 P.3d 473, 481–82 (Colo.2002) (collecting cases and holding "de novo review is the proper standard ... to determine whether a redacted affidavit is sufficient to establish probable cause"), we need not remand the case to the trial court for such a determination.

¶ 27 "Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched." *Hebert,* 46 P.3d at 482 (internal citation omitted). The warrant affidavit begins by summarizing the April 6 contact with Arapu and Inozemtseva at Arapu's apartment. It then describes the drugs Detective Chi observed "while preparing to leave and secure the unit." Specifically, Detective Chi saw:

> an open blue bag which contained a large block of a white powdery substance. The substance was in a clear plastic bag and appeared to your Affiant to be in excess of 4 grams. Through your Affiant[']s experience and training the substance is believed to be Cocaine. Your Affiant observed, sticking up in the blue bag, small 3/4″ × 3/4″ baggies, which your Affiant knows to be used in the packaging for sales of controlled substances like Cocaine.

¶ 28 We find that these statements in Detective Chi's affidavit aver sufficient facts to conclude drug-related contraband was located in Arapu's apartment. Thus, we hold the redacted affidavit established probable cause to issue a search warrant for drugs, drug paraphernalia, and related items in Arapu's apartment.

¶ 29 Next, we consider whether the firearm would have been discovered by means independent of Officer Olson's observation, and therefore should not be suppressed. Under the independent source exception to the exclusionary rule, "unconstitutionally obtained evidence may be admitted if the prosecution can establish that it was also discovered by means independent of the illegality." *People v. Morley,* 4 P.3d 1078, 1080 (Colo.2000); *see also Murray v. United States,* 487 U.S. 533, 542 & n. 3, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) ("what counts is whether the actual illegal search had any effect in producing the warrant"). The *Morley* and *Murray* cases are instructive in our analysis because those cases are factually similar to this case.

¶ 30 In *Morley,* officers executed a drug sting. After the sting was complete, officers prepared a search warrant application, but also decided to enter the suspect's apartment without a warrant to preserve evidence. 4 P.3d at 1079. The warrantless entry was not justified by an exigency and was therefore illegal. *See id.* at 1081. Nevertheless, we cited *Murray* and concluded the evidence subsequently obtained from the apartment pursuant to the search warrant should not have been suppressed because the independent source rule applied, in part, because the search warrant affidavit relied on facts obtained independent of the illegal entry. *Id.*

¶ 31 Similarly, *Murray* addressed a situation where federal agents entered a building without a warrant and viewed large quantities of marijuana. 487 U.S. at 535, 108 S.Ct. 2529. The agents could not justify the entry under an exception to the warrant requirement, but entered later pursuant to a search warrant that did not mention their prior observations inside the building. *Id.* at 536, 108 S.Ct. 2529. Under those facts, the Supreme Court found the marijuana should not be suppressed as long as "agents would have sought a warrant if they had not earlier entered the warehouse." *Id.* at 543, 108 S.Ct. 2529. The Court concluded the independent source rule must apply because "[i]nvoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Id.* at 541, 108 S.Ct. 2529 (citing *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)) (emphasis in original).

¶ 32 Applying the reasoning of *Morley* and *Murray* to this case makes clear that the firearm is admissible under the independent source exception to the exclusionary rule. First, the charging document reveals the crimes charged are all predicated on possession of a controlled substance, and as discussed above, the redacted affidavit in

support of the search warrant contained facts—obtained independent of Officer Olson's illegal observation—that established probable cause to issue a search warrant for controlled substances and related items in Arapu's apartment. We conclude that Detective Chi would have sought a search warrant for drugs regardless of whether the firearm had been seen. Second, we conclude the firearm would have been discovered when the search warrant was executed regardless of whether it had previously been seen. The search warrant authorized officers to search the entire apartment for "drug paraphernalia." This authorization suggests the scope of the warrant included a shelf near the apartment's front door in the same room where Detective Chi saw what appeared to be cocaine. Given the warrant authorized searching for drug paraphernalia, its scope included the space under a hat on the shelf where the firearm was partially concealed. Accordingly, we find that the trial court erred in suppressing evidence of the firearm.

### III.

¶ 33 For the foregoing reasons, we reverse the trial court's suppression order.

Chief Justice BENDER dissents, and Justice HOBBS and Justice BOATRIGHT join in the dissent.

Chief Justice BENDER, dissenting.

¶ 34 The majority holds that the scope of Arapu's consent to Detective Chi's presence in his apartment was broader than the scope found by the trial court. Because I believe that the trial court's factual determination of the scope of consent was supported by credible evidence, and thus not clearly erroneous, I would affirm its suppression order. Hence, I respectfully dissent.

### I.

¶ 35 Prior to making its ruling, the trial court held two hearings, at which it heard testimony from four witnesses, including the defendant, and considered eleven exhibits. Ultimately, in a lengthy written order, the trial court found as a matter of fact that Detective Chi's actions exceeded the narrow scope of Arapu's consent and therefore suppressed all of the evidence uncovered pursuant to a search warrant that was based on Detective Chi's unlawful observations.

¶ 36 The trial court found that on the morning of April 6, 2011, three special agents from U.S. Immigration and Customs Enforcement and four Aspen Police Department officers, including Detective Chi, traveled to Arapu's apartment in Aspen based on a tip that he was in the United States illegally. At about 8:50 a.m., the officers arrived at Arapu's apartment. After identifying themselves, the officers asked Arapu if they could enter his apartment. He said no and stepped out onto the landing in front of his apartment, leaving the door slightly ajar, to speak with the federal agents.

¶ 37 The trial court found that after speaking with the agents for a few minutes regarding his immigration status, Arapu stated that he wished to retrieve his immigration papers because they would help him answer the agents' questions. Because the agents had safety concerns about Arapu retrieving anything from his apartment, one of the agents suggested that he would retrieve the papers. Arapu denied this request and instead stated that a woman, Elena Inozemtseva, was inside his apartment and that she could retrieve the papers for him. At about the same time, one of the agents observed through the open apartment door that there was a partially dressed woman located within the apartment.

¶ 38 The agents stated that it was unsafe for them to be questioning Arapu while there was another individual inside his apartment and told him that either the woman had to come out of the apartment or he had to allow an officer inside to monitor her. The trial court found that Arapu again denied the request of the federal agents to enter his apartment, but that he agreed to allow Detective Chi into the apartment to monitor Inozemtseva. Apparently, Arapu had known Detective Chi previously and trusted him. Detective Chi entered the apartment and the agents resumed questioning Arapu.

¶ 39 The trial court found that, at approximately 9:10 a.m., the federal agents informed

Arapu that they were going to take him into custody. In response, Arapu asked Inozemtseva to collect his keys and cellphones and to lock the apartment. Detective Chi, who was still in the apartment, offered to do this task instead, and the trial court found that Arapu accepted this offer by stating "Thanks" or "OK."

¶ 40 After Arapu had been taken into custody and was removed from the scene, the trial court found that Inozemtseva gave Detective Chi Arapu's keys and cellphones. At this point, Detective Chi asked Inozemtseva for her name, date of birth, and identification. Inozemtseva stated that she did not have any identification, but agreed to write her name and date of birth on a piece of paper that Detective Chi then handed to one of the federal agents outside the door. Inozemtseva stated that she needed to leave for work, but was stopped by one of the federal agents as she attempted to exit the apartment. The trial court found that Inozemtseva then retreated into the apartment and was followed by the federal agent. Inozemtseva produced an expired passport to the agent. In response, the agent informed Inozemtseva that she was also being taken into custody.

¶ 41 As the agent was handcuffing Inozemtseva, another agent stepped into the apartment and alerted Detective Chi to the presence of a handgun underneath a hat on a shelf near the door. At this time, two additional federal agents stepped into the apartment and began photographing the gun. The trial court found that this occurred at around 9:20 a.m., or five to ten minutes after Arapu had been removed from the apartment.

¶ 42 Once the agents finished photographing the gun, Detective Chi finally moved to clear and secure the apartment. At this time, however, he noticed an open black bag on the floor underneath a coffee table. Inside the bag was a plastic bag that appeared to contain a significant amount of cocaine as well as other plastic baggies consistent with the distribution of cocaine. Detective Chi called in another Aspen police officer to take pictures of the drugs. Thereafter, at about 10 a.m., Detective Chi cleared and secured the apartment. Later that day, Detective Chi

included these observations in an affidavit that served as the sole basis for a warrant to search Arapu's apartment.

¶ 43 The trial court found that Detective Chi violated the narrow scope of the consent that Arapu gave him to enter the apartment. Arapu only consented to have Detective Chi enter the apartment to: (1) monitor Inozemtseva while Arapu was questioned outside of the apartment; and (2) collect his keys and cellphones and secure the apartment once he was in custody. Because it found that Detective Chi began questioning Inozemtseva after Arapu had already been removed from the scene and that it was unrelated to the task of collecting Arapu's keys and phones and securing the apartment, this action did not fall under either of the narrow forms of consent that Arapu gave.

¶ 44 Accordingly, the trial court found that Detective Chi was unlawfully present in Arapu's apartment when he observed the drugs in the black bag on the floor. Additionally, the trial court found that Arapu did not consent to the entry of any of the federal officers and thus found that any observations of the gun were unlawful. Thus, the trial court found that the search warrant was predicated on observations made in violation of the Fourth Amendment and suppressed the observations and any evidence uncovered as a result of the search warrant.

## II.

¶ 45 "It is clear that the scope of a consent search is limited by the breadth of the consent given." *United States v. Pena*, 920 f.2d 1509, 1514 (10th Cir.1990). Accordingly, the scope of a warrantless search that is based on consent is constitutionally limited to what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *see also People v. Dumas*, 955 P.2d 60, 62 (Colo.1998) ("A warrantless search conducted on the basis of consent is limited by the terms given by the consenting party.").

¶ 46 "Whether a search remained within the boundaries of the consent is a *factual*

*question* to be determined from the totality of the circumstances, and the trial court's factual determinations will be upheld on appeal unless they are clearly erroneous." *People v. Olivas*, 859 P.2d 211, 214 (Colo. 1993) (emphasis added); *see also People v. Minor*, 222 P.3d 952, 955 (Colo.2010). "It is the function of the trial court and not the reviewing court to weigh the evidence and determine the credibility of witnesses," and thus, "we will not substitute our judgment for that of the trial court...." *People v. Mendoza–Balderama*, 981 P.2d 150, 157–58 (Colo.1999). Accordingly, we must defer to the trial court's resolution of this factual question, so long as its underlying factual findings "are supported by competent evidence in the record." *People v. D.F.*, 933 P.2d 9, 14 (Colo.1997).

## III.

¶ 47 The present case involves two related factual questions: (1) what permission did Arapu give to Detective Chi to enter his apartment; and (2) did Detective Chi's actions exceed that permission? Unlike questions of law, these purely factual determinations are reserved primarily for the trial court. Accordingly, we afford them great deference and will not disturb them unless it can be said that they are unsupported by the record and thus clearly erroneous.

¶ 48 Applying this standard, I believe that the trial court's finding that Detective Chi's actions exceeded the narrow scope of Arapu's consent is supported by competent evidence from the record and thus its decision to suppress the evidence uncovered as the fruit of an illegal search was not clearly erroneous.

## A.

¶ 49 Initially, I disagree with the majority's finding that Detective Chi's questioning of Inozemtseva was implicitly within the consent that Arapu gave when he permitted Detective Chi to enter the apartment to ensure officer safety. *Id.* at ¶ 21. The majority reasons that this consent extended to De-

tective Chi's questioning of Inozemtseva in the apartment after Arapu had been arrested and removed. *Id.*

¶ 50 This reasoning, however, ignores two essential facts: (1) Arapu consented to Detective Chi's entry only for the narrow purpose of monitoring Inozemtseva while he was questioned by Agent Carter;[1] and (2) Detective Chi did not question Inozemtseva until after Agent Carter had completed his questioning of Arapu, arrested him, and removed him from the apartment. Therefore, at the time that Detective Chi began questioning Inozemtseva inside Arapu's apartment, the consent that Arapu gave to Detective Chi's presence had already expired. *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801 ("The scope of a search is generally defined by its expressed object."). Once Agent Carter completed his questioning of Arapu, Detective Chi was no longer lawfully within the apartment pursuant to the initial consent he received from Arapu.

¶ 51 The majority provides no support for its assertion that a reasonable person would understand that consent to allow a law enforcement officer to enter an apartment to ensure officer safety implicitly includes authority to question any individual that may be found within that home. Maj. op. at ¶ 21; *cf.* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1(c) (2004) (collecting federal cases that support the principal that "[w]hen a purpose is included in the request [to search], then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose"). This conclusion is further undermined by the trial court's finding that Inozemtseva asked Detective Chi to allow her to leave and the likelihood that Detective Chi could have lawfully questioned her once she left the apartment.

## B.

¶ 52 Next, the majority claims that Detective Chi's decision to remain in Arapu's apartment for upwards of ten minutes after

---

1. Arapu only consented to Detective Chi's entry because Agent Carter told him that he either had to order Inozemtseva (who was "half-dressed") outside (around 9 a.m. in early April in Aspen) or he had to permit Detective Chi's entry to allow him to monitor Inozemtseva.

Arapu had been arrested and removed was within the scope of Arapu's consent to allow Detective Chi to collect his phones and keys and to lock the apartment. Maj. op. at ¶¶ 23–24. The majority reasons that because Arapu's consent to Detective Chi's offer to complete this task did not include a "temporal limitation," it is reasonable to assume that this consent did not expire "until everyone had left, at which time securing the apartment [was] possible." *Id.* at ¶ 23.

¶ 53 This reasoning contravenes the "reasonable person" standard outlined in *Jimeno.* Rather than consider what a reasonable person would have inferred from a suspect's consent to allow an officer to gather his belongings and lock his apartment, the majority highlights Arapu's failure to set forth a time constraint to conclude that Detective Chi was lawfully present in the apartment so long as it was not yet empty. Before anyone began questioning Inozemtseva, the trial court found that she had already given Detective Chi the keys and cellphones. Thus, all that remained for Detective Chi to do was clear and secure the apartment. Instead, he allowed three federal agents to unlawfully enter and question Inozemtseva—who was attempting to leave—about her immigration status. Because, as a matter of law, I believe that an objectively reasonable person would understand consent to secure a dwelling to last only as long as it takes to do so, I would hold that the trial court's finding was not clearly erroneous.

¶ 54 In my view, it is inconsistent for the majority to acknowledge that the prosecution concedes that the officer that entered the apartment to view the gun did so unlawfully, *id.* at ¶ 26, while also maintaining that Detective Chi could not reasonably be expected to secure the premises until all of the "trespassers" that entered the apartment after the discovery of the gun had left. Under the objectively reasonable standard, I believe that an officer tasked with securing an apartment is also responsible for removing those that are unlawfully present. The only individual that was lawfully present, Inozemtseva, was attempting to leave.

¶ 55 Lastly, I disagree with the majority's implicit alternative reasoning that Detective

Chi's unconsented lingering in Arapu's apartment was harmless because he found the drugs at the time he moved to secure the apartment and thus would have seen them whether he had instantly moved to secure the apartment or, as he did, waited upwards of ten minutes to do so. *Id.* at ¶ 24. I find this reasoning speculative. *See People v. Diaz,* 53 P.3d 1171, 1176 (Colo.2002) ("Evidence is not admissible under the inevitable discovery exception based on speculation that the evidence would have been discovered anyway. The prosecutor must establish that there was a reasonable probability that the evidence would have been discovered in the absence of police misconduct, and that the police were pursuing an independent investigation at the time the illegality occurred." (Citations omitted)); *see also* LaFave, *supra,* § 11.4(a) ("[T]he 'inevitable discovery' rule simply is inapplicable in those situations where its use would, as a practical matter, operate to nullify important Fourth Amendment safeguards."). Even if the contraband were in plain sight, then it stands to reason that Detective Chi's presence in the apartment for upwards of ten minutes to watch the interrogation of Inozemtseva provided a much greater opportunity to discover the contraband than if he had been moving with purpose through the apartment to collect Arapu's belongings and to secure the apartment.

### III.

¶ 56 For the foregoing reasons, I would affirm the trial court's order suppressing the evidence obtained as a result of the unlawful search in excess of Arapu's narrow consent. Hence, I respectfully dissent.

I am authorized to state that Justice HOBBS and Justice BOATRIGHT join in the dissent.