Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 25, 2018

**2018 CO 64**

**No. 17SA165, In the Matter of James C. Wollrab—Colorado Rules of Professional Conduct—Attorney Discipline—Colo. RPC 1.8—Colo. RPC 4.2.**

In this attorney-discipline proceeding, the supreme court is confronted with questions as to what Colorado Rules of Professional Conduct 1.8 and 4.2 require of an attorney who enters into a business relationship with his client. The supreme court concludes that the attorney violated Rule 1.8(a)(1) when he signed a lease with his client's company without complying with any of Rule 1.8(a)'s prophylactic requirements. The supreme court also concludes that the attorney violated Rule 1.8(a)(3) when he entered into an option agreement with his client without obtaining his client's informed, written consent to his role in the deal.

Finally, because the attorney had the implied consent of his client's independent counsel for the purposes of the option agreement, the supreme court concludes that he did not violate Rule 1.8(a)(1) or (2) or Rule 4.2 in that transaction. The supreme court remands the case to the Hearing Board for determination of the appropriate sanction in light of the court's conclusions.

**The Supreme Court of the State of Colorado**

2 East 14th Avenue • Denver, Colorado 80203

---

**2018 CO 64**

---

**Supreme Court Case No. 17SA165**

*Original Proceeding in Discipline*

Appeal from the Office of the Presiding Disciplinary Judge 16PDJ062

---

**In the Matter of James C. Wollrab**

---

**Judgment Affirmed in Part and Reversed in Part**

*en banc*

June 25, 2018

---

**Attorneys for Complainant–Appellee:**

James C. Coyle, Attorney Regulation Counsel

Jacob M. Vos, Assistant Regulation Counsel

*Denver, Colorado*

**Attorneys for Respondent–Appellant:**

Fennemore Craig, P.C.

Troy R. Rackham

*Denver, Colorado*

**JUSTICE HART** delivered the Opinion of the Court.

¶1 In this attorney-discipline proceeding, we are confronted with questions as to what Colorado Rules of Professional Conduct 1.8 and 4.2 require of an attorney who enters into a business relationship with his client. Respondent James C. Wollrab asks us to reverse the Opinion and Decision Imposing Sanctions Under C.R.C.P. 251.19(b) of the Presiding Disciplinary Judge. Specifically, Wollrab appeals the Hearing Board's conclusions that: (1) he violated Rule 1.8(a) when he entered into a lifetime lease with his client's company without following the Rule's requirements; (2) he violated Rule 1.8(a) when he entered into an option agreement with his client without complying with those requirements; (3) he violated Rule 4.2 when he drafted that same option agreement and had his client sign it without the knowledge of the client's independent counsel; and (4) a suspension from the practice of law for a year and a day was the appropriate sanction for his misconduct.[1]

¶2 We conclude that the Hearing Board correctly determined that Wollrab violated Rule 1.8(a) when he signed a lease with his client's company. We also agree that Wollrab violated Rule 1.8(a)(3) when he entered into an option agreement with his client without obtaining his client's informed, written consent to his role in the deal. Because Wollrab had the implied consent of his client's independent counsel for the

---

[1] We note that Respondent, in both his Advisory Listing of Issues to be Addressed on Appeal and in the Issues section of his Opening Brief, failed to identify that he was appealing the Hearing Board's conclusion that he violated Rule 1.8 in entering into the lease. The People, however, had the opportunity—and took it—to respond to his arguments on this issue. Since there is no risk that the People were "misled as to the . . . judgment from which the appeal is . . . taken, any technical defect in the notice of appeal is harmless." Widener v. Dist. Court, 615 P.2d 33, 34 (Colo. 1980).

purposes of the option agreement, however, we reverse the Hearing Board's determination that he violated Rule 1.8(a)(1) and (2) and Rule 4.2 in the option agreement transaction. We remand this case to the Hearing Board for determination of the appropriate sanction in light of these conclusions.

## I. Facts and Procedural History

¶3 Wollrab was admitted to the Colorado bar in 1972. In 1975, he opened his own litigation firm in Boulder, Colorado, taking both criminal and civil cases.

¶4 Laszlo and Wendy Bagi ("Laszlo Bagi" or "Bagi," and "Wendy Bagi," respectively, and "Bagis," collectively) run a residential and commercial HVAC business, Bagi Mechanical, in Boulder. Since 1991, Wollrab has represented the Bagis in a variety of legal matters, and he had an attorney–client relationship with them at all times relevant to this case. Bagi considered Wollrab his attorney "in everything," except for matters outside of his expertise. For instance, the Bagis usually hired Clark Edwards, a corporate attorney, as counsel for their more complex business transactions. In addition, Wollrab and the Bagis spent holidays together, and Wollrab and Bagi were drinking buddies. Their attorney–client relationship was informal: they established a barter arrangement for their services in 2009, in which Wollrab "intuitively" kept track of the balance between the two.

¶5 The Bagis ran Bagi Mechanical out of leased offices in an industrial space on the outskirts of Boulder ("the Foothills property"). In 2010, the Bagis formed Foothills Management Group, LLC ("FMG"), which, at Wollrab's recommendation, obtained an option to purchase the Foothills property. To exercise the option, FMG had to provide

3

$50,000 in earnest money by April 15, 2011. After searching unsuccessfully to find funding, and as the option was nearing expiration, Bagi inquired whether Wollrab was interested in investing in the property. In April 2011, Wollrab decided that he wanted to invest in the Foothills property and insisted that Bagi retain Edwards to represent him in this deal. He did not, however, obtain the informed, written consent of the Bagis to his involvement in the deal. Edwards understood that Wollrab and Bagi had been having "considerable discussion[s]" about the deal, and did not prohibit or limit those discussions in any way after he was retained.

¶6 On April 19, 2011, Wollrab, Bagi, and Edwards met for two hours to discuss the deal and to hash out the terms of an option for Wollrab's investment. They agreed that for $50,000, Wollrab would obtain an option for a fifty percent ownership in BWI, LLC—a new company to which FMG would assign its option on the Foothills property—which could be exercised for an additional contribution of $150,000. Edwards understood that Wollrab would thus be providing the funds to exercise the original FMG purchase option.

¶7 Wendy Bagi had tendered a check to exercise FMG's purchase option on April 15, 2011, which was the last day the option could be exercised. On April 19, however, that check was returned for insufficient funds. To keep the option alive, the Bagis needed to provide $50,000 that very day. Thus, only hours after his meeting with Wollrab and Edwards, Bagi came to Wollrab's office, urgently needing $50,000. Wollrab attempted to call Edwards in order to have him draft a document reflecting the payment of $50,000, but could not reach him. Wollrab then quickly drafted the

4

following "Option to Purchase" (the "Option"), which both he and Bagi executed that afternoon:

> Laszlo Bagi and [FMG] has [sic] a contract to purchase 105 acres known as Foothills Business Park . . . . Laszlo Bagi and [FMG] is grants [sic] an option to James C. Wollrab to purchase fifty percent undivided interests [sic] in the property for $150,000.00 to be exercised at Mr. Wollrab's discretion at any time within the next ten years. Until the option is exercised, Laszlo Bagi and [FMG] and any of their assigns, successions [sic] in interest, partners, or joint ventures agree that the property will be rented under the management of Laszlo Bagi for not less than $60,000 month [sic] until the note and deed of trust are paid . . . for approximately 2.4 million dollars.

Wollrab believed the Option to be a binding document to protect his investment and intended to rely on it if needed. Wollrab drafted a check for $50,000, which Bagi took. Wollrab emailed and faxed the signed Option to Edwards that same day. Edwards did not respond or object to either the email or the fax.

¶8 Weeks after Wollrab and Bagi signed the Option, Wollrab sent an email to Edwards that stated, in pertinent part:

> This letter is my offer to have a business relationship with Laszlo Bagi. I need an acknowledgment that Laszlo Bagi has been a client of mine for several years. That this proposal to buy real estate together was not part of any of the legal work that I did for Mr. Bagi. . . . Your firm is representing him throughout the negotiations and your firm is drafting the closing documents for the purchase and the closing documents between myself and your clients . . . .

Ultimately, the deal to have FMG or BWI purchase the Foothills property fell through. A month later, Bagi purchased the property via a new entity, Green Hill Investments, LLC ("GHI"). Bagi was both part-owner and manager of GHI. Wollrab was not a party to this new deal.

5

¶9    Soon after GHI purchased the Foothills property, Wollrab mentioned to Bagi that he was looking for new office space. Bagi encouraged him to move his office into the Foothills property, rent-free, in exchange for legal work that Wollrab had previously performed without yet being compensated. In September 2011, Wollrab asked Bagi for a lease to guarantee that he would not have to move again before he retired in a few years. Wollrab also wanted to protect his use of the office space—including a below-market lease rate—against subsequent purchasers and preserve his ability to sublease the space. Bagi initially told Wollrab that he did not need a lease, but eventually agreed and sent Wollrab a copy of GHI's standard industrial lease—a fourteen-page document with fifty-four numbered provisions—which had been approved by the company's mortgage provider.

¶10   Wollrab took GHI's standard lease and "cut out everything that didn't apply," reducing it to one page (the "Lease"). Wollrab excised every standard tenant commitment that appeared in the standard lease, including tenant obligations to pay a security deposit, to secure insurance, to pay a pro rata share of utilities, to obtain consent to sublease or assign, to waive rights to recovery against the landlord for loss or damage on the premises, and to comply with the law. He also removed landlord protections from the standard lease, including the right to cancel the lease in the event of condemnation or casualty, remedies available upon tenant's default, and—critical to later events—a clause providing that the parties would not record the lease. Wollrab also added several key, unusual provisions that added additional obligations to GHI: requirements to keep the building "clean and professional"; to make improvements to

6

the ceiling, floor, and stairway "satisfactory to the tenant"; to install air conditioning; and to prohibit other tenants from using the premises for residential uses while allowing Wollrab to use his offices for residential or office use. Finally, Wollrab drafted the Lease to give himself a lifetime tenancy at a rate of $3.00 per square foot, or approximately $3000 per year in rent, including insurance, maintenance, and taxes.

¶11 Bagi, as manager for GHI, signed the Lease. Wollrab never advised Bagi to consult another attorney about the Lease's terms, nor did he obtain Bagi's informed, written consent to the essential terms of the Lease or his role in the transaction.

¶12 In 2014, Wollrab and the Bagis had a falling out stemming from Wollrab's use of the property. After this dispute, Wollrab recorded the April 2011 Option and the Lease against GHI,[2] clouding title to the Foothills property. The parties then sued each other in three different actions, which were eventually consolidated and later settled.

¶13 Attorney Regulation Counsel filed a disciplinary complaint, alleging that Wollrab violated Rule 1.8(a) (providing that an attorney should not enter into a business transaction with a client or acquire a possessory or pecuniary interest adverse to a client unless the terms are fair and fully disclosed, the client is advised in writing and given an opportunity to obtain independent legal counsel, and the client gives informed consent to the attorney's role in the transaction) when he entered into both the Option and the Lease without following the Rule's requirements. The complaint further

_____

[2] Wollrab had previously recorded both of these documents against Bagi and FMG in 2011, but re-recorded them against GHI in 2014 to ensure that a grantor/grantee index search would reveal these recordings.

alleged that Wollrab violated Rule 4.2 (providing that an attorney shall not communicate with a represented party unless the attorney has the consent of the other lawyer) when he communicated with Bagi about the Option without Edwards's consent.

¶14　　After a three-day hearing, the Hearing Board[3] concluded that Wollrab had violated Rule 1.8(a) when he entered into both the Lease and Option without complying with the Rule's requirements.[4]　The Board also concluded that Wollrab violated Rule 4.2's prohibition against communicating with a represented party when he drafted the Option for Bagi's signature.　For these violations, the Board imposed a sanction of suspension from practice for one year and one day.

¶15　　Wollrab filed a motion for post-judgment relief, which the Board denied. Wollrab then petitioned this court to review the Board's Opinion under C.R.C.P. 251.27.

## II. Analysis

¶16　　Wollrab argues that the Hearing Board misconstrued Rule 1.8 to apply to the Lease, which was not a transaction with a client, but a transaction with a non-client corporate entity (albeit one that was partially owned by a client).　Wollrab also contends that the Board erred in applying Rule 1.8 to the Option, as the overarching deal of which the Option was a part was never consummated, and therefore the Option itself

---

[3] The Hearing Board was composed of Hon. William R. Lucero, Presiding Disciplinary Judge, and two attorneys, Sherry A. Caloia and Thomas J. Herd.

[4] Hearing Board Member Caloia concurred that Wollrab violated Rule 1.8(a) with regards to the lease.　She believed, however, that Wollrab had violated only Rule 1.8(a)(3), and not Rule 1.8(a)(1) or (2) when he entered into the Option.

could not have been a "business transaction." Next, Wollrab argues that Rule 4.2 should not apply to the Option, either because he was acting as a business investor in a deal, and thus not "representing a client," or because he had Edwards's implied consent to communicate with Bagi. We address these arguments in turn.

## A. Standard of Review

¶17 "This court has exclusive jurisdiction over attorneys and the authority to regulate, govern, and supervise the practice of law in Colorado to protect the public." In re Kleinsmith, 2017 CO 101, ¶ 11, 409 P.3d 305, 308 (internal quotation marks omitted) (quoting Colo. Supreme Court Grievance Comm. v. Dist. Court, 850 P.2d 150, 152 (Colo. 1993)), cert. denied sub nom. Kleinsmith v. Colorado, 138 S. Ct. 1559 (2018). In this role, we have the plenary power to "review any determination made in the course of a disciplinary proceeding." C.R.C.P. 251.1(d). We review de novo the Hearing Board's legal conclusions. C.R.C.P. 251.27(b).

¶18 We generally overturn factual findings of the Board only if they are clearly erroneous. Kleinsmith, ¶ 11, 409 P.3d at 308 (citing C.R.C.P. 251.27(b)). However, where a respondent fails to designate the hearing record, depriving us of a transcript of the testimony, "review of the sufficiency of factual findings [is] unavailable under any standard," In re Roose, 69 P.3d 43, 46 (Colo. 2003), and "we consider the board's factual findings binding on review," People v. Lutz, 897 P.2d 807, 808 (Colo. 1995) (citing People v. Podoll, 855 P.2d 1389, 1390 n.1 (Colo. 1993)). Although Wollrab noted in his notice of appeal that "a transcript of the Hearing Board action is necessary," he failed to

9

designate the record. Without the transcript of the three-day hearing, we treat the Board's factual findings as binding in our review of this case.

## B. Rule 1.8(a)

¶19 The Colorado Rules of Professional Conduct include general prohibitions on conflicts between a lawyer's own personal interests and those of his current or former clients. See Colo. RPC 1.7, 1.9. They also include, in Rule 1.8, eleven circumstances in which the risk of conflict is so significant that it warrants setting out in detail the nature of the potential conflict and the steps that a lawyer must take to avoid that conflict. See Colo. RPC 1.8. As relevant here, Rule 1.8(a) provides that a lawyer who seeks to "enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client" must comply with three prophylactic provisions to ensure that the lawyer is not taking advantage of the client. Colo. RPC 1.8(a). First, the terms of the transaction or agreement must be "fair and reasonable to the client" and "fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client." Colo. RPC 1.8(a)(1). Second, the client must be "advised in writing of the desirability of seeking" independent legal advice and must be "given a reasonable opportunity" to do so. Colo. RPC 1.8(a)(2). And, finally, the client must give "informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction." Colo. RPC 1.8(a)(3). With these requirements, Rule 1.8(a) seeks to "prevent an attorney, who likely benefits from a considerable advantage when dealing with a client, from exploiting the

10

attorney–client relationship, given that the client should be free to repose a great deal of trust and confidence in the attorney." Calvert v. Mayberry, 2016 COA 60, ¶ 28, ___ P.3d ___ (quoting Rafel Law Grp. v. Defoor, 308 P.3d 767, 774 (Wash. Ct. App. 2013)).

### 1. The Lease

¶20 Wollrab argues that Rule 1.8(a) applies exclusively to transactions between an attorney and his client and that the Board therefore erred in applying it here. We disagree.

¶21 Although Bagi (as GHI's manager) signed the Lease, it was formally a transaction between Wollrab and GHI and not between Wollrab and Bagi. Wollrab is correct that GHI itself was not his client at the time of the Lease. The Lease thus was not a "business transaction with a client." But Rule 1.8(a) does not stop at putting guardrails around lawyers transacting business directly with their clients. It also applies its prophylactic requirements to situations in which an attorney "knowingly acquire[s] [a] . . . possessory . . . interest adverse to a client." Colo. RPC 1.8(a). The relevant question here is whether, in negotiating the Lease, Wollrab (1) knowingly acquired a (2) possessory interest adverse to a client. We agree with the Hearing Board that he did.

¶22 The Board found that Wollrab was aware that the Bagis "owned a substantial interest in GHI" and "knew that he was acquiring a possessory interest adverse to both GHI and the Bagis." Wollrab argues that the Board incorrectly presumed that Bagi and GHI were the same. We disagree. The Bagis partially owned GHI and Laszlo Bagi managed the company. The edited Lease omitted standard landlord protections and added provisions that were unusually protective of Wollrab's rights as a tenant. Any

11

negative impact on GHI from this Lease would necessarily impose negative consequences on the company's owners and manager.

¶23 The Hearing Board properly determined that Rule 1.8(a) applied to the Lease because the Lease gave Wollrab a possessory interest that was adverse to his clients. Because Wollrab does not contest the Board's determination that he failed to properly follow any of the three prophylactic requirements, we agree with the Board's conclusion that he violated Rule 1.8(a) with regards to the Lease.

## 2. The Option

¶24 We next turn to whether Wollrab violated Rule 1.8 when he entered into the Option with Bagi. As an initial matter, we must determine whether Wollrab and Bagi entered into a "business transaction" that would trigger Rule 1.8(a)'s prophylactic requirements. Colo. RPC 1.8(a). While the Rule does not itself define business transaction, we have previously said a "business transaction" is an "action that affects the actor's financial or economic interests, including the making of a contract," Allen v. Steele, 252 P.3d 476, 484 (Colo. 2011) (quoting Black's Law Dictionary, 227 (9th ed. 2009)). That definition was used in a different context in Allen, but we hold that it is appropriate for Rule 1.8 purposes as well. See LK Operating, LLC v. Collection Grp., 331 P.3d 1147, 1159 (Wash. 2014) (adopting the same definition of "business transaction" under Washington's former Rule 1.8).

¶25 In Wollrab's view, the Hearing Board erred in looking to the Option as a "business transaction" because it was only part of a larger deal to purchase the Foothills property. And since the larger deal ultimately failed, he argues, Rule 1.8(a) cannot

12

apply, as it does not apply to a proposed or failed transaction. We express no view here as to whether Rule 1.8(a) can apply to a proposed or failed business transaction because the Option itself was a business transaction, regardless of the failure of the larger deal.

¶26 When the larger Foothills deal fell apart, the Option remained as a consummated contract that affected Wollrab and Bagi's financial and economic interests. In exchange for $50,000 — which he needed immediately — Bagi gave Wollrab valuable consideration: a ten-year opportunity to buy a 50% stake in a potentially much more valuable endeavor. Although the Option's condition subsequent never came to fruition, this does not change the fact that at the time the Option was entered into, it was a binding, complete document that affected both parties' financial and economic interests. Certainly, the parties' extensive litigation around the Option and the fact that they entered into a monetary settlement in part because of the Option demonstrates that they believed the Option affected their financial interests. Entering into the Option was thus sufficient to trigger Wollrab's obligations under Rule 1.8(a).

¶27 To what extent, then, did Wollrab comply with those obligations in the context of the Option? Rule 1.8(a)(1) requires that the terms of the deal be reasonable, fair, and explained to the client clearly; Rule 1.8(a)(2) requires that the client be notified of his right to consult with an independent attorney; and Rule 1.8(a)(3) requires that the client give informed consent in writing. These basic requirements are modified in an important way by Comment 4 to Rule 1.8(a):

> If the client is independently represented in the transaction, paragraph (a)(2) of this Rule is inapplicable, and the paragraph (a)(1) requirement for full disclosure is satisfied either by a written disclosure by

13

the lawyer involved in the transaction or by the client's independent counsel. The fact that the client was independently represented in the transaction is relevant in determining whether the agreement was fair and reasonable to the client as paragraph (a)(1) further requires.

Colo. RPC 1.8 cmt. 4.

¶28 At the time Wollrab and Bagi entered into the Option, the Bagis were represented by Edwards, at Wollrab's urging. And as we will discuss further below, Edwards implicitly consented to Wollrab and Bagi's discussion about and signing of the Option. Thus, Bagi was represented for the purposes of the Option agreement, rendering Rule 1.8(a)(2) inapplicable. Moreover, the terms of the Option—which generally hewed to those discussed earlier that day between Wollrab, Bagi, and Edwards—were fully disclosed and transmitted in writing in a manner that could be understood by Bagi. The fact that the terms mirrored those discussed with Edwards earlier in the day also weighs in favor of the conclusion that they were fair and reasonable. See Colo. RPC 1.8 cmt. 4. We thus conclude that Wollrab did not violate either Rule 1.8(a)(1) or (2) with regard to the Option, and reverse the Hearing Board's decision as to those violations.

¶29 The Board made no finding, however, that Wollrab ever obtained Bagi's informed, written consent to the essential terms of the transaction or his role in it. And Comment 4 to Rule 1.8, which relieves a lawyer from his obligations under Rule 1.8(a)(1) and (2) when the client is represented by another attorney in the transaction, does not contain any suggestion that the lawyer is excused in that context

14

from complying with the requirements of Rule 1.8(a)(3). Thus, we affirm the conclusion that Wollrab violated Rule 1.8(a)(3) as to the Option.

## C. Rule 4.2

¶30 Wollrab next argues that the Hearing Board erred in concluding that he violated Rule 4.2 when he communicated with Bagi about the Option—including drafting a binding document for Bagi's signature—outside of Edwards's presence. He makes two arguments here: (1) Rule 4.2 by its plain language does not apply to an attorney who is acting as a participant or an investor in a business transaction; and (2) he did not violate Rule 4.2, even if it did apply, because he had the implied consent of Bagi's attorney, Edwards. Because we agree on the latter issue, we have no need to reach the former.

¶31 We begin again with the text of the Rule:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, <u>unless the lawyer has the consent of the other lawyer</u> or is authorized to do so by law or a court order.

Colo. RPC 4.2 (emphasis added). An opposing lawyer may consent or acquiesce to direct discussions with his client. Restatement (Third) of the Law Governing Lawyers § 99 cmt. j (Am. Law Inst. 2000). Such "consent may be implied rather than express, such as where such direct contact occurs routinely as a matter of custom, unless the opposing lawyer affirmatively protests." <u>Id.</u>

¶32 The Board found that Edwards had "implicitly consented to . . . ongoing business discussions" between Wollrab and Bagi. Did that consent extend to Wollrab's drafting of the Option for Bagi's signature without Edwards's knowledge or review? The Board

concluded that the consent did not encompass Wollrab "presenting legal documents for Mr. Bagi's signature in Edwards'[s] absence." We disagree, and believe the preparation and signing of the Option was within the scope of Edwards's implied consent.

¶33 As an initial matter, we must determine the correct standard of review for determining the extent or scope of implied consent. As discussed above, the Board's factual findings are binding on this court. See Lutz, 897 P.2d at 808. Thus, we can only question the Board's determination that Edwards's consent did not extend to the drafting and signing of legal documents if the inquiry into the scope of implied consent under Rule 4.2 is a legal one subject to de novo review.

¶34 We have not before addressed whether the scope of implied consent in this context is legal or factual. The one context in which we have previously considered this question is in evaluating whether a police search was reasonable under the Fourth Amendment based on whether it was within the scope of consent given by the defendant who was searched. See People v. Arapu, 2012 CO 42, ¶ 17, 283 P.3d 680, 684; People v. Minor, 222 P.3d 952, 955 (Colo. 2010). In that context, we have "delineate[d] between a clear error review of the facts and circumstances surrounding the charge and a de novo review of questions of law, including the scope of consent provided." Minor, 222 P.3d at 955 (emphasis added) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Under the Fourth Amendment, we concluded that "[r]eview of a trial court's order on the scope of a suspect's consent to search is a mixed question of fact and law." Arapu, ¶ 17, 283 P.3d at 684 (citing Minor, 222 P.3d at 955).

16

¶35    Tempting as it would be to simply extend the rule from <u>Minor</u> and <u>Arapu</u> to our current situation, we do not believe it is appropriate to do so.  We rested those decisions on the Supreme Court's holding in <u>Florida v. Jimeno</u> that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" 500 U.S. at 250–51 (citations omitted).  In applying <u>Jimeno</u> in our decision in <u>Minor</u>, we did not examine whether the nature of the scope-of-consent inquiry is inherently legal.  <u>See</u> 222 P.3d at 955.  Instead, we were persuaded by the fact that <u>Jimeno</u> prescribes a legal test for the scope of consent in a Fourth Amendment inquiry.  <u>Id.</u>  Thus, we still must perform our own analysis as to whether the scope of implied consent is factual or legal in the context of Rule 4.2.

¶36    In <u>Miller v. Fenton</u>, the U.S. Supreme Court adopted a methodology for distinguishing questions of fact from questions of law.  474 U.S. 104, 113–17 (1985).  In that case, the Court was faced with the question of whether voluntariness of a confession was an issue of fact or law for purposes of determining whether a state court's conclusions should be presumed to be correct in a federal habeas review.  <u>Id.</u> at 113.  The Court laid out considerations for how to determine whether an issue is legal or factual when "the issue falls somewhere between a pristine legal standard and a simple historical fact."  <u>Id.</u> at 114.  We find the Court's approach instructive for our purposes here.

¶37    Making this determination requires us to examine both "the nature of the inquiry itself" and practical considerations as to whether "one judicial actor is better positioned

17

than another to decide the issue in question." Id. at 114–15. In looking at the nature of the inquiry, we consider whether the issue is simply one of discerning historical facts or whether it is a hybrid inquiry that also requires ascribing legal significance to those historical facts. See id. at 116. The practical considerations to examine include whether the question requires assessing demeanor or credibility, and is thus better suited to a trial court, or whether it is an inquiry in which the "relevant legal principle can be given meaning only through its application to the particular circumstances of a case," id. at 114, and is thus appropriate for resolution by an appellate court.

¶38 Taking this approach here, we conclude that the inquiry into the scope of implied consent under Rule 4.2 is a mixed question of fact and law. An important aspect of the inquiry, of course, is the discernment of historical fact: observations about the parties' interactions such as what they did or said in the particular situation. Those questions are factual in nature. But a determination that there was implied consent—and the scope of that consent—necessarily requires ascribing legal significance to those facts: namely, whether they give rise to an inference that a party has implicitly consented to a course of action. As such, we conclude that the inquiry into the scope of implied consent is a mixed question of fact and law. Thus, while we defer to the Board's findings as to the underlying facts, we review the Board's conclusions about the legal consequences of those facts de novo.

¶39 The Hearing Board correctly concluded that Edwards had implicitly consented to Wollrab and Bagi's continued communications about the Foothills transaction. The Board was incorrect, however, in limiting the scope of that consent to exclude the

drafting and signing of the Option. Wollrab and Bagi had known each other for many years, and spoke "all the time" about a variety of matters. They had significant one-on-one contact about the Foothills deal before Bagi had retained Edwards, and Wollrab was the person who recommended that Bagi retain Edwards for that deal. Edwards testified that "it was clear that there was considerable discussion" between the two men about the deal, and he "did not prohibit those sorts of discussions." Indeed, we find it significant that Edwards never limited Wollrab and Bagi's communications, despite knowing that they frequently spoke and worked together. Edwards also knew that Wollrab would be providing Bagi with the money for the Foothills transaction. Finally, the fact that Edwards never responded or objected to Wollrab's actions when Wollrab emailed and faxed the signed Option agreement to him is further evidence that his actions fell within Edwards's implied consent. See People v. Quintana, 665 P.2d 605, 610 (Colo. 1983) (citing United States v. Hale, 422 U.S. 171, 176 (1975)) ("In some situations, however, where the normal reaction is to speak out in response to a statement, silence may have some probative value.").

¶40 Since we conclude that Edwards had implicitly consented to Wollrab's interactions with Bagi, including the drafting and signing of the Option, we reverse the Board's conclusion that Wollrab violated Rule 4.2.

## III. Conclusion

¶41 We affirm the Hearing Board's determination that Wollrab violated Rule 1.8(a) as to the Lease. We also affirm the determination that Wollrab violated Rule 1.8(a)(3) when he entered into the Option with Bagi without obtaining his informed, written

19

consent to the terms of the deal and Wollrab's role in it.  Because we conclude, however, that Wollrab had Edwards's implied consent for the purposes of the Option, we reverse the Board's determination that he violated Rule 1.8(a)(1) and (2) and Rule 4.2 in the Option transaction.  We remand this case to the Hearing Board for determination of the appropriate sanction in light of these conclusions.