Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2017 CO 80**

**No. 14SC870, <u>People v. Stock</u>—Fourth Amendment—Exceptions to Warrant Requirement—Consent Searches—Third-Party Consent.**

The supreme court reviews the court of appeals' opinion reversing Stock's convictions and remanding for a new trial.  The court of appeals concluded that the trial court erred in denying Stock's motion to suppress statements she made to a police officer inside the hotel room where Stock lived.  The police officer had entered the hotel room after Stock's father—who did not live in the hotel room—opened the door in response to the officer's knock.  The court of appeals concluded that suppression was required because Stock's father lacked authority to consent to the officer's entry.

The supreme court concludes that the trial court properly denied the motion to suppress because, on the facts of this case, the officer's limited entry into Stock's hotel room, in her immediate presence and without her objection, did not violate Stock's Fourth Amendment right to be free from unreasonable searches.  The supreme court therefore reverses the judgment of the court of appeals and remands the case for further proceedings consistent with this opinion.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 80

**Supreme Court Case No. 14SC870**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 11CA1271

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Susan Leigh Stock.

## Judgment Reversed

*en banc*
July 3, 2017

**Attorneys for Petitioner:**
Cynthia H. Coffman, Attorney General
Carmen Moraleda, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Respondent:**
Douglas K. Wilson, Public Defender
Kielly Dunn, Deputy Public Defender
  *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents.

¶1     In 2011, a jury convicted Susan Stock of third degree burglary and theft for stealing money from vending machines at the hotel where she worked.  The court of appeals reversed Stock's convictions, concluding that the trial court erroneously denied Stock's motion to suppress statements she made to a police officer who had entered the hotel room where she lived.  Stock's father, who was Stock's invited guest in the room, had opened the door on Stock's behalf in response to the officer's knock, and moved aside to allow the officer to step a few feet inside the hotel-room door.  The officer then requested and obtained Stock's express permission to come further into the room to speak with her.  The court of appeals reasoned that the police officer's entry into the hotel room was unlawful because Stock's father lacked authority to consent to the officer's entry into the hotel room.  In reviewing the court of appeals' decision, we are therefore asked to decide whether the officer's entry into Stock's hotel room violated her Fourth Amendment right to be free from unreasonable searches.  Importantly, this case does not require us to decide whether Stock's father had authority to consent to a full-blown search of the room; rather, the narrow question before us is whether Stock's father could consent to the officer's limited entry a few feet inside the door.

¶2     On the facts of this case, we conclude that Stock conferred authority on her father to consent to the officer's limited entry.  The trial court therefore properly denied Stock's motion to suppress, and her statements to the officer were admissible at trial.  Accordingly, we reverse the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶3     The following facts are drawn from witness testimony and the trial court's findings of fact at Stock's suppression hearing on January 14, 2011.

¶4     Susan Stock worked as a front-desk clerk at a Best Western hotel in Winter Park, Colorado.  Stock lived in a room at the hotel.  In May 2010, the hotel manager discovered that she was missing a key to one of the hotel vending machines and that money had been emptied from the machine.  Suspicious that an employee had taken the money, the manager reported the theft to a detective with the Fraser–Winter Park Police Department.  The detective visited the hotel and made appointments to interview four hotel employees, one of whom was Stock.  On May 18, the detective interviewed Stock in the hotel's front lobby.  During that interview, Stock denied taking the key and money.

¶5     Two days later, on May 20, Stock reversed course and confessed to the hotel's owner that she had stolen money from the hotel's vending machines.  The hotel manager called the police department, reported that one of the employees had confessed, and asked for an officer to respond.  A uniformed police officer went to the hotel and spoke to the owner.  The hotel owner related to the officer that Stock had confessed and was presently in her hotel room.  The hotel owner provided the officer with directions and the room number.

¶6     The officer went to Stock's hotel room and knocked on the door. Stock's father, whom the officer knew was not a resident of the hotel room, answered the door. The father opened the door and stepped back into the hotel room, allowing the officer to

step inwards. The officer understood the father's action to be an invitation to enter the room. Stock's hotel room was a typical single-room unit with a small entryway, a bathroom on the right side, a bed, and some furniture. The officer took a couple of steps past the hotel-room door and introduced himself. Stock's father asked the officer whether he should remain in the room. The officer asked the father to leave, and the father stepped outside into the hallway. As the father was leaving, the officer saw Stock, who had been on the bed crying when her father opened the door.

¶7 The officer asked Stock if he could speak with her, and Stock responded, "Yes." Stock then cleared off a seat in her room for the officer and offered it to him. The officer took the seat and had a thirty-minute conversation with Stock, during which she admitted to taking money from the hotel's vending machines. Stock also produced the vending-machine key and gave it to the officer.

¶8 The People charged Stock with third degree burglary in violation of section 18-4-204(1), C.R.S. (2016), and theft of cash with a value of $1,000 or more, but less than $20,000, in violation of section 18-4-401(2)(c), C.R.S. (2009). Stock moved to suppress her statements to the officer and the evidence obtained as a result of the officer's entry, arguing that the officer's entry into the room was illegal and that the officer's questioning constituted a custodial interrogation necessitating Miranda warnings. The court held a hearing on the motion, and the parties presented testimony from Stock, her father, the officer, and the detective who had initially interviewed Stock on May 18. Stock testified at the hearing that she did "not really" want the officer to enter her room. However, the trial court found that aspects of Stock's testimony were contradictory, and

4

that Stock's credibility was impaired by her prior felony conviction and her self-interest in having the suppression motion granted.

¶9     The court issued a bench ruling denying the motion to suppress, but later expressed concern as to whether it had correctly concluded that the officer's entry into the hotel room was lawful. The court therefore invited the parties to submit written briefing on the issue. The court then issued a written order reaffirming its earlier ruling denying the motion to suppress. The court's written order relied principally on People v. White, 64 P.3d 864, 872 (Colo. App. 2002), in which the court of appeals concluded that a family friend visiting the defendant's father as an overnight houseguest had authority to consent to a police entry into an area of the father's house where a visitor normally would be received. In this case, the trial court reasoned that the officer's entry into Stock's hotel room was analogous to the lawful police entry in White because Stock's father was a close relative, not a casual visitor, and because he had merely allowed the officer to step into the entry area to the hotel room where guests normally would be received. The trial court therefore concluded that Stock's father had authority to let the officer into the entry area of the hotel room. The trial court also reasoned that Stock's father "opened the door for his daughter because she was on the bed crying" when the officer knocked. Finally, the court found from the evidence at the motions hearing that Stock and her father were waiting for law enforcement; the court noted that neither of them acted surprised or asked the officer why he had come to Stock's room. Accordingly, the trial court again concluded that the officer's entry into the hotel room was lawful and denied the motion to suppress.

¶10 Stock's three-day jury trial took place in March 2011. The officer testified about Stock's confession in her hotel room on May 20. Stock testified in her own defense. She admitted taking money from the vending machines but claimed that she intended to return the money once she received a commission that she expected for ski-rental customer referrals. The jury convicted Stock of both counts.

¶11 On appeal, Stock again argued that her statements should have been suppressed because the officer's entry into her hotel room was unlawful. In an unpublished decision, a panel of the court of appeals agreed. People v. Stock, No. 11CA1271, slip op. at 7–9 (Colo. App. Sept. 11, 2014) (not published pursuant to C.A.R. 35(f)). The court of appeals concluded that the trial court had erred in relying on White because, in its view, White "does not stand for the legal proposition that any visitor who is more than a casual visitor has the authority to allow law enforcement officers into another person's home without that person's consent." Id. at 7. Instead, the court of appeals concluded that the father lacked authority to consent to the officer's entry because the father did not live in the hotel room. Id. at 7–8. And because the officer knew the father did not reside there, the court of appeals further concluded that the officer could not have formed a reasonable (albeit mistaken) belief that the father possessed common authority over the room. Id. at 8. The court of appeals therefore reversed Stock's judgment of conviction and remanded the case for a new trial. Id. at 14.

¶12 We granted the People's petition for writ of certiorari to review the court of appeals' ruling.[1]

## II. Analysis

### A. Standard of Review

¶13 Review of a trial court's suppression order presents a mixed question of law and fact. People v. Simpson, 2017 CO 25, ¶ 12, 392 P.3d 1207, 1210. In reviewing a trial court's suppression ruling, we defer to the trial court's findings of historical fact that are supported by competent evidence in the record, but we assess the legal effect of those historical facts de novo. Id. We may affirm a trial court's suppression ruling on any grounds supported by the record. Moody v. People, 159 P.3d 611, 615 (Colo. 2007) ("[A]ppellate courts have the discretion to affirm decisions, particularly denial of suppression motions, on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those relied upon by the trial court.").

### B. Fourth Amendment Principles

¶14 The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. A parallel provision of the Colorado Constitution likewise protects against unreasonable searches and seizures and is

---

[1] We granted certiorari to review the following issue:

> Whether a police officer's entry into the defendant's hotel room constituted an unreasonable entry that violated the Fourth Amendment, where the officer was invited by the defendant's father and the defendant herself consented to the entry.

7

generally coextensive with the Fourth Amendment. Colo. Const. art. II, § 7; Simpson, ¶ 16, 392 P.3d at 1211.

¶15 The Fourth Amendment does not proscribe all government searches; rather, it proscribes only those that are unreasonable. Florida v. Jimeno, 500 U.S. 248, 250 (1991). A warrantless entry into a person's home is presumptively unreasonable unless it falls within a recognized exception to the Fourth Amendment's warrant requirement. See People v. Taube, 864 P.2d 123, 129 (Colo. 1993).

¶16 One such recognized exception is the voluntary consent of a person authorized to grant such consent. United States v. Matlock, 415 U.S. 164, 170–71 (1974). The Supreme Court has long approved of consensual searches "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Jimeno, 500 U.S. at 250–51. Where a third party (rather than the subject of the search) communicates consent, the search is invalid unless the third party has the authority to consent to the particular search at issue. Stoner v. California, 376 U.S. 483, 487–90 (1964). A third party's authority to consent to a search of a premises typically stems from the third party's "common authority" over the premises, arising from "mutual use of the property by persons generally having joint access or control for most purposes."[2]

---

[2] Additionally, a defendant's right to be free from unconstitutional searches is not violated when an officer reasonably, but mistakenly, concludes that a third party possesses the requisite "common authority" to consent. Illinois v. Rodriguez, 497 U.S. 177, 181, 187–89 (1990); Petersen v. People, 939 P.2d 824, 830 (Colo. 1997). In these circumstances, the consent given is invalid, but there is nevertheless no Fourth Amendment violation because the government's search based on the appearance of the requisite authority is not unreasonable. Rodriguez, 497 U.S. at 183–84.

Matlock, 415 U.S. at 171 n.7; People v. Strimple, 2012 CO 1, ¶ 21 n.7, 267 P.3d 1219, 1224 n.7. However, both the Supreme Court and this court have also recognized a third party's authority to consent to a search where the subject of the search has conferred authority to consent to the third party. See Stoner, 376 U.S. at 487–89 (discussing whether police had a basis to believe that the defendant had authorized a hotel night clerk to permit police to search the defendant's room); Petersen v. People, 939 P.2d 824, 829 (Colo. 1997) (discussing "authority conferred to an agent by express or implied delegation").

¶17　In the context of any third-party consent—as in all Fourth Amendment inquiries—the touchstone for determining the constitutionality of the search is reasonableness, Jimeno, 500 U.S. at 250, and "[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself," United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). Of "great significance" in assessing the Fourth Amendment reasonableness of a search based on third-party consent are our culture's "widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." Georgia v. Randolph, 547 U.S. 103, 111 (2006); see also Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978) (subject's reasonable expectation of privacy depends in part on "understandings that are recognized and permitted by society"); Minnesota v. Olson, 495 U.S. 91, 99–100 (1990) (same).

¶18　Regardless of social expectations, however, the consent given must be voluntary, as "determined from the totality of all the circumstances." Schneckloth v. Bustamonte,

412 U.S. 218, 227 (1973). Consent to a search need not be express, but may be implied from the context and circumstances. See Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016) ("[C]onsent to a search need not be express but may be fairly inferred from context . . . ." (citing Florida v. Jardines, 133 S. Ct. 1409, 1415–16 (2013), and Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978))); People v. Hyde, 2017 CO 24, ¶ 21, 393 P.3d 962, 967. In addition, the scope of consent given is limited to "that of 'objective' reasonableness"—that is, what "the typical reasonable person [would] have understood by the exchange [with] the officer" about the nature and extent of the search that was authorized. Jimeno, 500 U.S. at 251.

## C. Application

¶19    Given the Fourth Amendment's defining emphasis on reasonableness and the "great significance" given to "widely shared social expectations," Randolph, 547 U.S. at 111, we conclude that the officer's limited entry into Stock's hotel room, in her immediate presence and without her objection, did not violate Stock's Fourth Amendment right to be free from unreasonable searches. As previously noted, we need not decide whether Stock's father had authority to consent to a search of the entire room; instead, the narrow question before us is whether Stock's father could consent to the officer's limited entry a few steps inside the door.

¶20    On the facts of this case, we conclude that Stock conferred on her father the authority to consent to the officer's limited entry. The third party who allowed the officer to enter the room was an adult family member and Stock's invited guest. He answered the hotel-room door and stepped aside to allow the officer to step inside, and

10

did so in Stock's immediate presence and with her knowledge. Stock did not object in any way to her father's actions; to the contrary, the events immediately after the officer's entry confirm that Stock had in fact conferred to her father the authority to consent to the officer's limited entry.

¶21 First, after the officer stepped into the room, the father asked whether he should stay, indicating both that the officer's arrival was expected, and that the father had permitted the officer to enter for the purpose of speaking with Stock, who was present in the room just a few feet away. Next, Stock expressly agreed to talk with the officer and proceeded to clear a seat for him in the room. These actions are inconsistent with Stock's present contention that she did not consent to the officer's entry; to the contrary, they further confirm that she had, in fact, given her father authority to permit the officer to enter the hotel room to speak with her. Although Stock testified at the suppression hearing that she did "not really" want the officer to enter the room and speak to her, the trial court did not credit that testimony, instead finding that aspects of Stock's testimony were contradictory and that her credibility was affected by her prior felony conviction and her self-interest in having the suppression motion granted.

¶22 Further, the trial court's conclusion that the father's gestures constituted an expression of consent to enter is supported by substantial evidence. The trial court found that the father "welcomed [the officer] into the room by opening the door fully for him and stepping back." On this issue, the officer testified that the father stepped back from the door, and the trial court specifically found that the officer's account of the entry was credible.

11

¶23    From the officer's side of the interaction, the opening door revealed an adult whom the officer knew was a close relative of Stock's. And although the officer knew the father was not staying in that room, the prevailing social expectation is that visitors can rely on invitations to enter given by adult guests of a dwelling because one generally does not answer a door if one has not been authorized by the resident to either admit or turn away visitors. See, e.g., People v. Ledesma, 140 P.3d 657, 705 (Cal. 2006) ("[T]he police may assume, without further inquiry, that a person who answers the door in response to their knock has the authority to let them enter."). That is, there is a common social expectation that houseguests will confer with residents before admitting a visitor. Cf. Olson, 495 U.S. at 99 ("[F]ew houseguests will invite others to visit them while they are guests without consulting their hosts . . . ."). Additionally, that the person who answered the door was known to be a close relative of Stock's further suggests that the two would be in communication, giving Stock the opportunity to express her wishes regarding the admission or refusal of guests.

¶24    The officer also knew that Stock was physically present in the room because the hotel owner had told the officer he could find Stock in her room. And because Stock's hotel room was a typical single-room unit, Stock presumably would have been aware of the officer's knock, giving her the opportunity to turn away the police officer, had she so wished. Given our "widely shared social expectations," the immediate physical presence of the resident who is the subject of a search is a particularly significant fact because that individual has a clear opportunity to refuse consent. Fernandez v. California, 134 S. Ct. 1126, 1133–35 (2014); Randolph, 547 U.S. at 113–20; see also

12

Strimple, ¶¶ 31–39, 267 P.3d at 1225–26. Indeed, under such circumstances, the "inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant": the police may not thereafter conduct a consent search in the inhabitant's presence. Randolph, 547 U.S. at 122–23.

¶25 Importantly, the nature and scope of the consent given in this case were also limited. See Florida v. Jardines, 133 S. Ct. 1409, 1416 (2013) ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."). Although the Fourth Amendment "draw[s] a firm line at the entrance to the house," Payton v. New York, 445 U.S. 573, 590 (1980), the subject of a consent search is free to modify that firm line by "delimit[ting] as he chooses the scope of the search to which he consents," Jimeno, 500 U.S. at 252; see also People v. Arapu, 2012 CO 42, ¶ 16, 283 P.3d 680, 684 ("[C]onsent . . . may include express or implied limitations.").

¶26 Here, the father allowed the officer merely to step past the entryway for the limited purpose of speaking to the father and Stock, and not for the purpose of searching the room for evidence. Had the father suggested that the officer could rifle through Stock's belongings, it would not have been reasonable for the officer to infer that the father had authority to consent to such a search without further inquiry. See People v. McKinstrey, 852 P.2d 467, 473 (Colo. 1993) ("[P]olice officers . . . should make reasonable inquiries when they find themselves in ambiguous circumstances regarding the authority of the third party to consent to the search."); cf. Randolph, 547 U.S. at 112 ("'[A] child of eight might well be considered to have the power to consent to the police crossing the threshold into [the entryway]' . . . but no one would reasonably expect such

13

a child to be in a position to authorize anyone to rummage through his parents' bedroom." (quoting 4 Wayne LaFave, Search and Seizure § 8.4(c) (4th ed. 2004))).

¶27 In sum, considering the totality of these circumstances, we reach the same conclusion as the trial court: that the father consented to the officer's limited entry into Stock's hotel room on her behalf, with Stock's authorization.

¶28 Stock argues that instead of entering into the hotel room upon the father's gesture of invitation, the officer should have waited outside the threshold to obtain consent directly from Stock herself. However, the Supreme Court has cautioned against treating third-party consent cases as inquiries into alternative measures the police might have taken. Randolph, 547 U.S. at 122 (reasoning that inviting other cotenants to refuse consent would transform "every [third-party] consent case [into] a test about the adequacy of the police's efforts to consult with a potential objector"); cf. Illinois v. Lafayette, 462 U.S. 640, 647 (1983) ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means."). Similarly here, we need not consider counterfactual scenarios about what the officer might have done, given our conclusion that, on the particular facts of this case, Stock's father had authority to consent to the officer's limited entry in her immediate presence.

¶29 Finally, because we conclude that the officer's entry was justified on other grounds, we need not reach the People's argument that the entry was justified under the court of appeals' decision in People v. White, 64 P.3d 864 (Colo. App. 2002). In that case, the court of appeals concluded that a family friend visiting the defendant's father

14

as an overnight houseguest had authority to consent to a police entry into the area of the father's house where a visitor would normally be received.  Id. at 871–72.  As we have explained above, the validity of a search depends not on whether a unique third-party consent rule applies to a home's receiving area; rather, the validity of a search depends on the particular circumstances and nature of the search and consent given.

### III.  Conclusion

¶30     On the facts of this case, we conclude that Stock conferred on her father the authority to consent to the officer's limited entry into her hotel room, in her immediate presence.  The trial court therefore properly denied Stock's motion to suppress, and her statements to the officer were admissible at trial.  Accordingly, we reverse the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.

**JUSTICE GABRIEL** dissents.

JUSTICE GABRIEL, dissenting.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In light of this plain language, it has long been settled that "the Fourth Amendment has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590 (1980).

Today, the majority substantially erases this firm line by upholding a police officer's warrantless entry into respondent Susan Leigh Stock's home despite the absence of any evidence that she had consented to the officer's initial entry. To reach this conclusion, the majority surmises consent based on a series of inferences and assumptions that supposedly show that Stock had given her father the authority to consent to the officer's "limited entry" into the home. Maj. op. ¶ 27.

Because (1) I perceive no evidence in the record to support a conclusion that Stock authorized her father to let the officer into her home and (2) I believe that the majority's conclusion is contrary to longstanding Fourth Amendment jurisprudence, I respectfully dissent.

## I. Factual Background

In the course of its analysis, the majority relies on a significant number of inferences and assumptions. For example, the majority states:

1

- "[A]fter the officer stepped into the room, the father asked whether he should stay, indicating . . . that the officer's arrival was expected." Id. at ¶ 21.

- "Stock expressly agreed to talk with the officer and proceeded to clear a seat for him in the room. These actions are inconsistent with Stock's present contention that she did not consent to the officer's entry; to the contrary, they further confirm that she had, in fact, given her father authority to permit the officer to enter the hotel room to speak with her." Id.

- "[A]lthough the officer knew the father was not staying in that room, the prevailing social expectation is that visitors can rely on invitations to enter given by adult guests of a dwelling because one generally does not answer a door if one has not been authorized by the resident to either admit or turn away visitors." Id. at ¶ 23.

- "[B]ecause Stock's hotel room was a typical single-room unit, Stock presumably would have been aware of the officer's knock, giving her the opportunity to turn away the police officer, had she so wished." Id. at ¶ 24.

¶36 None of these inferences and assumptions, however, finds support in the record. Instead, the above-quoted statements appear to reflect the majority's own findings as to what Stock and her father might have known, done, or presumed, given the majority's assumed social expectations.

¶37 Respectfully, I do not see this as our proper role. To the contrary, as the majority correctly states, we must defer to the trial court's findings of historical fact that are supported by competent evidence in the record, but we assess the legal effect of those historical facts de novo. Id. at ¶ 13 (citing People v. Simpson, 2017 CO 25, ¶ 12, 392 P.3d 1207, 1210).

¶38 In my view, the pertinent facts of record, which are largely undisputed, are as follows:

¶39 Stock lived and worked at a hotel in Winter Park, Colorado. After confessing to the hotel's owner that she had stolen money from the hotel's vending machines, the hotel manager called the police department to report the theft and to request that an officer respond. An officer did so and spoke with the hotel's owner, who told the officer that Stock was in her room at the hotel. The owner gave the officer the room number, and the officer proceeded to that room. Notably, the officer testified that when he first responded to the hotel, he did not know that he was going to be interviewing Stock. Moreover, Stock testified to her understanding that the hotel owner did not wish to press charges against her. These facts undermine the majority's inference that the officer's arrival at Stock's room was expected.

¶40 The officer found Stock's room and knocked on the door. No evidence indicated that the officer had announced, "Police," or otherwise identified himself as he knocked.

¶41 Stock's father, who the officer knew did not reside there, answered the door. No evidence indicated that Stock had asked him to do so, and at the time her father answered the door, Stock was in the center of the room crying. The father opened the door, at which point, according to the father, the officer asked to speak with Stock and asked the father to leave. The father stepped back, allowed the officer to enter, and then left, pursuant to the officer's instructions. The record does not indicate that Stock paid any attention to what her father was doing at the door. Nor does the record indicate that Stock had invited the officer into her home, consented to his entry, or authorized her father to let the officer in. To the contrary, Stock specifically testified that she did

3

<u>not</u> invite the officer in and did <u>not</u> consent to his coming into her home, and her father likewise testified that Stock had never invited the officer in.

¶42 In my view, these are the facts that must drive our analysis, and I turn next to that analysis.

## II. Analysis

¶43 I begin by noting the Fourth Amendment principles and related authorities that govern this case. I then apply those principles to the record facts before us and conclude that Stock did not consent to the officer's entry into her home, thus establishing a Fourth Amendment violation.

## A. Fourth Amendment Principles

¶44 As the majority observes, the Fourth Amendment and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures. Maj. op. ¶ 14. Construing this prohibition, we have said that a warrantless entry into a person's home is per se unreasonable and in violation of the Fourth Amendment unless it falls within one of a few well-delineated exceptions. <u>People v. Taube</u>, 864 P.2d 123, 129 (Colo. 1993).

¶45 The voluntary consent of a person authorized to grant such consent is one recognized exception to the Fourth Amendment's warrant requirement. <u>United States v. Matlock</u>, 415 U.S. 164, 170–71 (1974). As the Supreme Court has explained, such voluntary consent need not necessarily come from the defendant himself or herself:

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a

4

third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

Id. at 171; accord Petersen v. People, 939 P.2d 824, 827–28 (Colo. 1997).

¶46 The common authority that justifies third-party consent rests on the "mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7; accord Petersen, 939 P.2d at 827–28.

¶47 In addition to consent given by the defendant or a person with common authority over the premises, both the United States Supreme Court and this court have recognized that the voluntary consent exception can be satisfied (and a search can be deemed reasonable) when a police officer reasonably but mistakenly believed that a third party who had consented to a warrantless entry had common authority over the property. See Illinois v. Rodriguez, 497 U.S. 177, 185–89 (1990); Petersen, 939 P.2d at 830–31.

¶48 As this court has observed:

> Apparent authority is not a lesser version of common authority. An apparent authority analysis begins by conceding that the consent obtained by police is legally invalid because the consenting third party lacks sufficient authority over the property to consent to a search. Apparent authority is not authority at all, but merely the appearance of authority. A search justified by the apparent authority doctrine is not authorized by consent from one with authority to give it. Rather, such a search, without valid consent, does not violate the Fourth Amendment because it is not unreasonable. The doctrine relies on the fact that the determination of a third party's authority to consent is a factual determination, and that mistakes of fact can be reasonable under certain circumstances.

Petersen, 939 P.2d at 830–31 (citing Rodriguez, 497 U.S. at 183).

5

¶49 The People bear the burden of proving the existence of an exception to the Fourth Amendment's warrant requirement. Id. at 827; accord People v. Santisteven, 693 P.2d 1008, 1012 (Colo. App. 1984); see also People v. Fuerst, 2013 CO 28, ¶ 11, 302 P.3d 253, 256 (noting that a warrantless search of a home by the police is presumptively unreasonable and that to overcome this presumption the prosecution has the burden of showing that the warrantless search was justified under one of the narrow exceptions to the warrant requirement). Mere acquiescence to a claim of lawful authority, however, is insufficient to establish consent to a warrantless entry. Santisteven, 693 P.2d at 1012.

¶50 With these principles in mind, I turn to the facts of this case.

## B. Application

¶51 Here, it is undisputed that Stock did not personally invite the officer into her home. Indeed, she testified, without contradiction, that she had neither invited nor consented to the officer's entry.

¶52 It is further undisputed that Stock's father did not have common authority over Stock's home. Specifically, no evidence showed—and no party contended—that Stock's father had joint access to or control over Stock's room at the hotel.

¶53 And it is undisputed that Stock's father did not have the apparent authority to allow the officer to enter. The officer knew that the father did not reside there, and the People do not contend that the officer harbored a reasonable but mistaken belief that Stock's father had common authority over the room. See Rodriguez, 497 U.S. at 185–89 (noting that apparent authority is based on a police officer's reasonable but mistaken

6

belief that a third party who consented to a warrantless entry had common authority over the property); Petersen, 939 P.2d at 830–31 (same).

¶54 The question thus becomes whether Stock authorized her father to consent to the officer's entry into her home. Unlike the majority, I perceive no evidence to support a conclusion that she did. Specifically, nothing in the record shows that Stock directly authorized her father to consent to the officer's warrantless entry into her home, and the majority cites no such evidence. Instead, the majority infers such authorization from the existing and assumed circumstances. But it does so without record support.

¶55 Nor do I believe that Stock's conduct after the officer had entered her home establishes the requisite consent. In reaching its conclusion that Stock had authorized her father to allow the officer to enter the home, the majority principally relies on the facts that once the officer was in the home, Stock agreed to speak with him and even cleared a place for him to sit. Maj. op. ¶ 21. The Fourth Amendment violation, however, occurred when the officer crossed the "firm line at the entrance to the house." Payton, 44 U.S. at 590. Moreover, the majority does not explain, nor do I perceive, how Stock's post-violation conduct here bears on any authority that she may have given her father. Specifically, the fact that Stock agreed to speak to the officer after he had already entered her home says nothing about how or when Stock authorized her father to allow the officer to enter. This is especially true here, where (1) Stock testified that she did not invite the officer into her home and did not consent to his entry, (2) Stock's father likewise testified that Stock had never invited the officer into the home, and (3) Stock testified that she felt that she was required to speak to the officer at that point.

7

¶56 The cases on which the majority relies for the proposition that consent may be implied from the context and circumstances, see maj. op. ¶ 18, likewise do not support its inference of consent. Specifically, Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016), and People v. Hyde, 2017 CO 24, ¶ 21, 393 P.3d 962, 967, both involved statutory implied consent to warrantless blood and breath tests in cases involving people suspected of driving under the influence. In cases such as these, by statute, a driver's consent to a warrantless blood or breath test can be inferred from the driver's own conduct—namely, exercising the privilege to drive. Here, in contrast, we have no statute delineating what conduct would evince implied consent. Nor do we have evidence that Stock did anything to consent to the officer's warrantless entry into her home. Instead, we have (1) the majority's inferences and assumptions, based on what it views to be prevailing social expectations, and (2) Stock's post-violation agreement to speak with the officer, which, on the facts presented here, I believe to be irrelevant.

¶57 Florida v. Jardines, 133 S. Ct. 1409, 1415–16 (2013), and Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978), which, as the majority notes, Birchfield cited, are even less helpful.

¶58 In Jardines, 133 S. Ct. at 1415–16, the Court contrasted a homeowner's placing a knocker on his or her front door with a police officer's having a trained police dog explore the area around the home in hopes of discovering incriminating evidence. The Court observed that the knocker would evince the owner's invitation to knock to attempt to gain entry. See id. In contrast, the owner could not be deemed to have implicitly consented to the search involving the dog. See id. at 1416.

¶59 In <u>Marshall</u>, 436 U.S. at 313, the Court noted the exceptional case of certain industries in which the history of close governmental regulation is so pervasive that a proprietor could not assert a reasonable expectation of privacy in the operation of the enterprise.

¶60 Neither of these cases supports the majority's inference of consent in the present case. To the contrary, they generally affirm the right of people to be free from warrantless intrusions into their homes absent either express consent or <u>narrowly circumscribed</u> implied consent.

¶61 Finally, I do not believe that the broad "inferred consent" exception that the majority appears to adopt is sufficiently articulated such that our trial judges will be able to apply it with consistency. Although I appreciate the majority's efforts to limit its holding to the facts of this case, it is unclear to me how the exception that the majority appears to adopt will be applied in future cases. Is the size of the home determinative? (The majority emphasizes that Stock's home was "a typical single-room unit." Maj. op. ¶ 6.) Does it matter how far into the home the officer ventured? (The majority deems it pertinent that the officer "took a couple of steps past the hotel-room door" and refers to the officer's entry as "limited." <u>Id.</u> at ¶¶ 6, 27.) Does inferred consent turn on whether the defendant was present or nearby? And if so, how near is near enough? (The majority makes a point of noting that Stock "was present in the room just a few feet away." <u>Id.</u> at ¶ 21.)

¶62 The doctrines of actual authority, common authority, and apparent authority clearly delineate methods of proving consent, and those doctrines can easily be applied.

9

In contrast, the majority's apparent "inferred consent based on the circumstances" exception provides no discernible standard, and I fear that such an exception could potentially be applied so broadly that it would swallow the Fourth Amendment rule against warrantless entries into a person's home, at least in cases involving third-party consent.

### III. Conclusion

¶63 Although the evidence in this case does not suggest, nor do I intend to imply, that the officer here acted with anything other than good faith, the officer's conduct must be measured against well-settled case law delineating what police officers must do to vindicate every citizen's Fourth Amendment right to be secure in his or her home.

¶64 Here, for the reasons set forth above, I believe that the officer's warrantless entry into Stock's home crossed the Fourth Amendment's firm line. Because the People have not established Stock's consent to this warrantless entry and because I cannot endorse what I view to be the majority's significant expansion of the consent exception to the Fourth Amendment's warrant requirement, I respectfully dissent.