23CA1491 Peo v Alvarado-Vasquez 07-31-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1491
Arapahoe County District Court No. 20CR1295
Honorable Eric B. White, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mauricio Alvarado-Vasquez,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE TAUBMAN*
Welling and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Eric A. Samler, Alternate Defense Counsel, Hollis Whitson, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Defendant, Mauricio Alvarado-Vasquez, appeals his judgment of conviction entered after a jury found him guilty of two counts of first degree murder (after deliberation); first degree murder (felony murder); three counts of conspiracy to commit first degree murder; tampering with a deceased human body; tampering with evidence; five counts of attempted first degree murder (after deliberation); two counts of first degree assault; second degree assault; accessory to crime; and racketeering under the Colorado Organized Crime Control Act (COCCA).  We affirm.

## I.    Background

¶ 2    From 2019 to 2020, law enforcement officials investigated two cliques of the MS-13 gang in Aurora.  As a result of this investigation, Alvarado-Vasquez and nineteen codefendants received multiple charges related to a series of criminal episodes allegedly executed by the cliques.  The charges included several counts of first degree murder, conspiracy to commit first degree murder, tampering with evidence, first degree assault, unlawful distribution of cocaine, and COCCA violations, among others.

¶ 3    The two cliques were known as Leeward Locas Salvatrucha (LLS) and Gutierrez Locas Salvatrucha (GLS).  Their rival gang was

1

the 18th Street gang. Josue Tobia-Carbajal and David Tobia-Carbajal[1] led the GLS faction. Alvarado-Vasquez headed the LLS faction.

¶ 4     Alvarado-Vasquez's twenty-five[2] charges stemmed from the following four criminal episodes of which a reasonable jury could find the following facts:

Murder of V.D.

¶ 5     V.D. had been associated with the 18th Street gang in California. On September 7, 2019, she and her friend were at Lempira, an Aurora bar and nightclub. V.D. went outside to her Jeep after a GLS/LLS associate asked her to give him a cigarette. As she was leaning into her car to retrieve one, David and Alvarado-Vasquez approached. With a knife held to her throat, V.D. was forced into her Jeep. Then, her Jeep and other cars containing GLS/LLS associates caravaned to Josue's house. There, David and

---

[1] We refer to these brothers throughout this opinion by their first names, rather than their shared last name, to avoid confusion.
[2] In addition to the eighteen charges listed above, and two charges of which he was acquitted, Alvarado-Vasquez was convicted of an additional five counts of enhanced sentencing under our crime of violence statute. He does not appeal these convictions.

Alvarado-Vasquez stabbed V.D. to death. V.D.'s body was found in a burning car on the side of an interstate highway the next day.

### Murder of C.R.

¶ 6    On November 2, 2019, David and GLS/LLS associates were at Lempira when David instructed them to watch C.R., another 18th Street gang member. After the bar closed, C.R. left in his car. Several GLS/LLS associates, Alvarado-Vasquez, and David followed him in their own cars. C.R.'s car turned, David and Alvarado-Vasquez's car followed it, and then Alvarado-Vasquez shot C.R.

### Drive-by Shooting

¶ 7    On November 11, 2019, after a night at Lempira, six people, including 18th Street gang members, left the nightclub in their car. GLS/LLS members, including Alvarado-Vasquez, followed them in a black SUV. When the car containing 18th Street gang members pulled over to let the GLS/LLS SUV pass, Alvarado-Vasquez fired shots into the car, hitting several of its passengers.

### Conspiracy to Commit Murder of A.P.

¶ 8    From October to November 2019, Alvarado-Vasquez and Josue asked a waitress to set up a meeting with A.P., an 18th Street gang member. They explained to the waitress that they wanted to kill

3

A.P. She informed them where A.P. would be one night, and Alvarado-Vasquez and Josue went to look but did not find him.

COCCA Charge

¶ 9    To prove the COCCA charge, the prosecution presented expert testimony about the origins and structure of MS-13. Additionally, it presented evidence of an uncharged murder, witness testimony, and other evidence to prove the individuals charged operated as a gang.

¶ 10    After a sixteen-day trial, Alvarado-Vasquez was convicted on all counts but two. He was sentenced to two consecutive life sentences without the possibility of parole in the custody of the Department of Corrections for the three first degree murder convictions. For the others, the court sentenced Alvarado-Vasquez to more than 400 years in prison.

¶ 11    Alvarado-Vasquez now appeals, arguing the trial court erred when it (1) admitted evidence of an uncharged homicide to prove the COCCA charge; (2) denied his motion to suppress; (3) admitted certain expert testimony; and (4) denied his tendered implicit bias jury instruction.

## II. Evidence of Uncharged Murder

¶ 12    Alvarado-Vasquez maintains the trial court erred when it admitted evidence of an uncharged murder because it was not relevant and was unduly prejudicial. We disagree.

### A. Applicable Law and Standard of Review

¶ 13    Intrinsic acts, exempt from the evidentiary rule governing admission of other crimes evidence, include acts that directly prove the charged offense. *Rojas v. People*, 2022 CO 8, ¶ 52, 504 P.3d 296, 309. As with all evidence, intrinsic act evidence must be relevant — having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — to be admitted. CRE 401. However, even relevant evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice or, among other reasons, "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403.

¶ 14    A person is guilty of violating the COCCA statute if that person is "employed by, or associated with, any enterprise" and "knowingly conduct[s] or participate[s], directly or indirectly, in such enterprise

through a pattern of racketeering activity." § 18-17-104(3), C.R.S. 2024. "Pattern of racketeering" means engaging in at least two acts of racketeering activity, which are related to the conduct of the enterprise. § 18-17-103(3), C.R.S. 2024. An "enterprise" is "any . . . group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities." § 18-17-103(2). "Racketeering activity" means actions to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit, among other things, murder. § 18-17-103(5)(b)(I).

¶ 15    A COCCA associated-in-fact enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *McDonald v. People*, 2021 CO 64, ¶ 44, 494 P.3d 1123, 1131 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). The existence of the enterprise must be proved apart from the charged pattern of racketeering activity. *Id.* at ¶ 45, 494 P.3d at 1131.

¶ 16    We review a trial court's evidentiary ruling for abuse of discretion. *Bondsteel v. People*, 2019 CO 26, ¶ 45, 439 P.3d 847, 854. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.* We review nonconstitutional errors that were preserved by objection for harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119. Under this standard, reversal is required only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *Id.*

## B.    Additional Facts

¶ 17    To prove that the GLS/LLS factions operated as a criminal enterprise, the prosecution introduced evidence of the uncharged murder of M.G.G. in February 2019. Jurors heard testimony that two members of GLS/LLS stabbed to death M.G.G., a member of the 18th Street gang, to achieve a higher rank in MS-13. Alvarado-Vasquez was not involved in that incident.

¶ 18    The prosecution argued that the incident proved one of the necessary elements in its COCCA charge — the existence of the criminal enterprise separate and apart from the criminal charges before the court. The trial court agreed and admitted evidence of the incident as long as its presentation included the promotion of

7

GLS/LLS members within MS-13 because of the murder. It also issued contemporaneous limiting instructions. These instructions told the jury that Alvarado-Vasquez was not charged with the murder of M.G.G. and to consider the evidence only to determine if an enterprise existed under the COCCA charge.

### C. Analysis

¶ 19 Alvarado-Vasquez argues the court's admission of evidence of M.G.G.'s murder was not relevant because it did not make it more probable that he was associated with a criminal enterprise. Moreover, he contends the evidence was cumulative, and therefore unduly prejudicial, in light of the prosecution's other evidence. We disagree.

¶ 20 The evidence related to M.G.G.'s murder was highly relevant because it was an intrinsic act proffered to prove that GLS/LLS operated as an "enterprise" under the COCCA statute. Contrary to Alvarado-Vasquez's contention, his lack of association with M.G.G.'s murder was a key factor in its relevancy. The prosecution needed to show the GLS/LLS factions had engaged in a *pattern* of criminal activity beyond the alleged criminal episodes involving Alvarado-Vasquez. *McDonald,* ¶ 46, 494 P.3d at 1132 ("In other

8

words, although a COCCA associated-in-fact enterprise may exist only to commit the pattern of racketeering activity, it must also have an ongoing organization of associates functioning as a continuing unit that 'unit[es] its members in a cognizable group' beyond the fact that its members committed the predicate crimes, *Nelson v. Nelson*, 833 F.3d 965, 968 (8th Cir. 2016) . . . ."). Although Alvarado-Vasquez was not charged with M.G.G.'s murder, this evidence demonstrated that the GLS/LLS cliques' pattern of activity existed beyond the other offenses with which he was charged.

¶ 21    M.G.G.'s murder also met the three required elements stated in *McDonald*. *Id.* at ¶ 44, 494 P.3d at 1131 (explaining an enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose" (quoting *Boyle*, 556 U.S. at 946)). The incident illustrated that the GLS/LLS factions operated as a purposeful, cognizable group, given that the members performed a common criminal activity: committing murders of 18th Street gang members to increase their status in MS-13. Further, the associates involved in M.G.G.'s murder were

9

also shown, through other evidence, to have relationships or direct involvement with the GLS/LLS associates involved in Alvarado-Vasquez's related criminal activity. Finally, longevity was indicated because M.G.G.'s murder predated any of the criminal episodes charged in the case at hand.

¶ 22 Nevertheless, Alvarado-Vasquez contends that a "gang manifesto" later found in his duffel sufficiently proves COCCA's enterprise element, making the evidence related to M.G.G.'s murder less probative, inflammatory, and cumulative. However, Alvarado-Vasquez later contradicts himself, stating that "the only [piece of evidence of] evidentiary value found in the duffel bag was the firearm." To the extent Alvarado-Vasquez means the photo of a "gang manifesto" found on his phone, it is not a clear evidentiary substitute. It does not show how GLS/LLS members "functioned as a continuing unit" or how long the cliques had been in existence. *Id.* at ¶ 42, 494 P.3d at 1131-32 (quoting *Boyle*, 556 U.S. at 943).

¶ 23 Likewise, as long as admitted evidence adheres to Colorado's Rules of Evidence, it is immaterial if the "gang manifesto" could have been substituted for evidence of M.G.G.'s murder. *People v. Morales*, 2012 COA 2, ¶ 9, 298 P.3d 1000, 1003 ("The prosecution

10

is generally entitled to prove the elements of its case against a defendant by evidence of its own choice . . . .").

¶ 24      For his remaining contentions that various expert and witness testimony make the admission of M.G.G.'s murder unduly prejudicial, Alvarado-Vasquez provides no record citations to this alleged testimony.  Therefore, we do not consider these arguments. C.A.R. 28(a)(7); *see Black v. Black*, 2018 COA 7, ¶ 67, 422 P.3d 592, 604; *O'Quinn v. Baca*, 250 P.3d 629, 631-32 (Colo. App. 2010) (holding that "parties 'should not "expect [an appellate] court to peruse the record without the help of pinpoint citations"'" (quoting *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 975 n.1 (7th Cir. 2002))).

11

## III. Duffel Bag

¶ 25　Alvarado-Vasquez next contends the trial court erred by using the independent source doctrine to uphold the search of his duffel bag.[3]  We are not persuaded.

### A. Additional Facts

¶ 26　In December 2019, law enforcement officials located Alvarado-Vasquez at a Gunnison motel, where he was staying while working in a temporary construction job.  Acting on an arrest warrant, a coalition of local, state, and federal law enforcement officers arrested him in the motel's hallway.  Law enforcement officials then conducted a protective sweep for other individuals in his motel room based on the allegations of violent crimes and gang affiliations against Alvarado-Vasquez.  No one was found in the room, but officers noticed an open duffel bag in plain view.  A necklace on top

---

[3] Alvarado-Vasquez also argues that admission under the inevitable discovery doctrine was inappropriate.  Since he does not develop this argument, we do not consider it.  *See People v. Mershon*, 874 P.2d 1025, 1035 n.13 (Colo. 1994) (declining to address arguments raised in a cursory, conclusory, or perfunctory fashion), *abrogated on other grounds by Melton v. People*, 2019 CO 89; *People v. Roberts*, 2013 COA 50, ¶ 18 n.4, 321 P.3d 581, 585 n.4 ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

of it matched surveillance photos of Alvarado-Vasquez from previous suspected criminal episodes. Looking further into the bag, an officer saw a notebook, clothing, and what appeared to be the back end of a firearm pistol grip. This officer then pulled open the bag's handles to "make sure [the bag was] safe to transport." After further opening the bag, officers confirmed that it contained a gun. Without further disturbing or unloading the gun, officers seized the bag and held it while they applied for a search warrant.

¶ 27 Several days later, the officers submitted a thirty-nine-page affidavit for a search warrant of the bag's contents. After a magistrate granted the warrant, the officers retrieved the gun, and the prosecution later connected it to the November 2 murder of C.R. and the November 11 drive-by shooting incident.

¶ 28 Alvarado-Vasquez moved to suppress the gun and other items seized from the duffel bag before his trial. Following a suppression hearing, the trial court held that law enforcement officers had conducted an unconstitutional search when they further opened the bag after seeing the necklace. However, the court denied Alvarado-Vasquez's motion to suppress, holding the evidence recovered from the duffel bag was admissible under the

independent source doctrine. It explained that the affidavit submitted to support the warrant cited evidence linking the observed documents, jewelry, and clothing, as well as the firearm, to Alvarado-Vasquez. Therefore, the court reasoned, the officers' affidavit showed their decision to seek a warrant was independent of their observations during their illegal search for the gun.

¶ 29 Additionally, it explained that the affidavit's description of the larger investigation also gave officers a reason to search the duffel bag apart from any mention of the gun. The trial court then found, after excising references to officers' observations or actions related to the illegally discovered gun, that the magistrate who had issued the warrant had a substantial basis for issuing the warrant given that probable cause existed to search the duffel bag based on the remaining information in the affidavit.

## B. Standard of Review

¶ 30 When reviewing a suppression order, we defer to the trial court's findings of fact, if supported by the record; and we review its legal conclusions de novo. *People v. Miller*, 75 P.3d 1108, 1111-12 (Colo. 2003). However, we review de novo whether a redacted

14

affidavit is sufficient to establish probable cause. *People v. Hebert*, 46 P.3d 473, 481 (Colo. 2002).

## C. Applicable Law

¶ 31 The Colorado Constitution and the Fourth Amendment to the United States Constitution protect people from unreasonable governmental searches and seizures. Colo. Const. art. II, § 7; U.S. Const. amend. IV; *People v. McKnight*, 2019 CO 36, ¶ 36, 446 P.3d 397, 406. Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and must be suppressed from presentation in the government's case-in-chief. *People v. Schoondermark*, 759 P.2d 715, 718 (Colo. 1988). The exclusionary rule applies both to the illegally obtained evidence itself and to the "fruit of the poisonous tree" — any other evidence derived from the illegally obtained evidence. *Id.* (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

¶ 32 However, the independent source doctrine is an exception to the exclusionary rule. *People v. Arapu*, 2012 CO 42, ¶ 32, 283 P.3d 680, 687. This exception provides that "unconstitutionally obtained evidence may be admitted if the prosecution can establish that it was also discovered by means independent of the illegality." *Id.* at

15

¶ 29, 283 P.3d at 686 (quoting *People v. Morley*, 4 P.3d 1078, 1080 (Colo. 2000)). Among other circumstances, the doctrine may apply when evidence was initially discovered during an unlawful warrantless entry or search but later seized (or re-seized) after the police executed a valid search warrant. *People v. Dominguez-Castor*, 2020 COA 1, ¶ 20, 469 P.3d 514, 520.

¶ 33 To show that the warrant was genuinely an independent source of the evidence, the prosecution must prove that (1) the decision to seek the warrant was not prompted by what was observed during the initial unlawful search; and, in situations where law enforcement officers use evidence from the illegal search to supply probable cause to support the search warrant, (2) the magistrate had a substantial basis for issuing the search warrant apart from the illegally obtained information. *Id.* at ¶ 21, 469 P.3d at 520; *Hebert*, 46 P.3d at 481. A search warrant is validly issued when probable cause exists supported by an oath or affirmation particularly describing the place to be searched or the things to be seized. *Hebert*, 46 P.3d at 482. "Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence

16

of criminal activity is located at the place to be searched." *People v. Quintana*, 785 P.2d 934, 937 (Colo. 1990). The affidavit must supply a "sufficient nexus between criminal activity, the things to be seized, and the place to be searched." *People v. Kazmierski*, 25 P.3d 1207, 1211 (Colo. 2001).

### D. Analysis

¶ 34 Alvarado-Vasquez argues there was not a substantial basis for the search warrant once information gleaned from the illegal search was excised. He asserts that the affidavit's reference to the observed necklace, clothes, and notebook was not enough to cause a reasonable person to believe that evidence of criminal activity would be found in the duffel bag. *Quintana*, 785 P.2d at 937. Moreover, he claims that the court erroneously relied on evidence surrounding his arrest to justify the duffel bag search. *Groh v. Ramirez*, 540 U.S. 551, 568 (2004) (explaining probable cause to arrest a person will not itself justify a warrant to search his or her property).

¶ 35 However, the affidavit demonstrates the necklace and notebook provided a substantial basis for the warrant apart from any gun-related evidence. It established that Alvarado-Vasquez had

worn a crucifix-style necklace like the one plainly visible in the duffel bag on the night of V.D.'s murder. The affidavit included surveillance photos showing that a car containing Alvarado-Vasquez and other MS-13 associates had followed V.D.'s Jeep and pulled into a gas station. In these photos, Alvarado-Vasquez, wearing a black shirt and a crucifix-style necklace, entered the gas station to purchase a cigarette lighter. Another MS-13 associate purchased and filled a gas can. The car and Jeep were then seen driving down the highway, the Jeep was set on fire, and the car containing Alvarado-Vasquez left.

¶ 36 This evidence from the broader investigation linked Alvarado-Vasquez with the crucifix-style necklace and V.D.'s murder, and thus a person could reasonably infer that a bag containing a crucifix-style necklace similar to the one worn at a crime scene might contain further evidence from that incident. *People v. Hakel*, 870 P.2d 1224, 1229 (Colo. 1994) ("[T]he link between suspected criminal activity and a specific location to be searched may be established by circumstantial evidence and proper inferences drawn therefrom.").

¶ 37     Moreover, the evidence surrounding the notebook provided an additional basis for the magistrate to grant the request for the search warrant. The detailed affidavit explained that Alvarado-Vasquez consented to the search of his phone shortly after his arrest. On his phone, officers found a photo showing a notebook full of writings, in Spanish, describing, among other things, the significance of MS-13 and other various words and symbols associated with it. Seeing that the officers had also observed a plainly visible notebook inside the duffel bag shortly before Alvarado-Vasquez's arrest, a reasonable person could have "believe[d] that it contained a 'gang manifesto'" or other relevant evidence of MS-13 membership.

¶ 38     Therefore, given the affidavit's presentation of the evidence surrounding the necklace and the notebook, we conclude the trial court did not err in finding the evidence admissible under the inevitable discovery doctrine.

## IV.   Expert Testimony

¶ 39     Alvarado-Vasquez next contends the court abused its discretion in admitting a firearm analyst's opinion maintaining that bullets found at the murder scene of C.R. and at the drive-by

shooting were fired from the gun found in Alvarado-Vasquez's duffel bag. We disagree.

## A. Additional Facts

¶ 40 Prior to trial, Alvarado-Vasquez objected to the admission of the prosecution's firearms expert, Scott Webb of the Colorado Bureau of Investigation. Specifically, he objected to Webb's use of firearms and toolmark analysis to determine if the firearm found in the duffel bag was used in any of the charged criminal episodes.

¶ 41 Alvarado-Vasquez claimed the industry's analytical methods lacked sufficient reliability. The lack of reliability, he asserted, was demonstrated in *Strengthening Forensic Science in the United States: A Path Forward* (2009), a report by the National Research Council of the National Academy of Sciences (NAS) that found that decisions of toolmaker examiners were subjective, "based on unarticulated standards and no statistical foundation for estimation of error rates." *Id.* at 153-54.

¶ 42 Specifically, the 2009 NAS report stated:

> A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. . . . AFTE [Association of Firearm and Toolmark Examiners] has adopted a theory of identification, but it does not

provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks know to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

*Id.* at 155.

¶ 43 Alvarado-Vasquez additionally pointed to *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), by the President's Council of Advisors on Science and Technology (PCAST), which found firearms analysis fell short of foundational validity and the studies cited to support their work were often "not appropriately-designed" and "underestimate the false positive rate." *Id.* at 106. He also cited several scholarly

21

articles and judicial decisions that recognized the limitations of firearm and toolmark identification analysis.

¶ 44 After an evidentiary hearing under *People v. Shreck*, 22 P.3d 68 (Colo. 2001), to determine the admissibility of Webb's testimony, the court held the process of firearm and toolmark analysis was reliable and admitted Webb as an expert. The court based its admissibility decision on Webb's explanation of the methodology behind toolmark analysis and how the methodology was widely accepted in the scientific community. Specifically, it highlighted Webb's testimony providing context to the studies cited by the defense. Webb testified that the 2009 NAS report's sole purpose was to "see how we can further strengthen these sciences" and that there were only "five pages dedicated to firearm toolmark examination specifically." He explained that "there [were] no messages that this is junk science . . . it was just how can we improve the testing." Likewise, he testified that the 2016 PCAST report also did not conclude firearm toolmark analysis was "junk science" and asserted that toolmarks can be unique to different tools and identified as such under certain magnification. Webb added that a study done in response to the 2009 NAS report and

highlighted by the 2016 PCAST report, the 2014 Ames I study, placed the field's error rate at one percent. The court also cited Webb's testimony that firearm toolmark identification had been around for more than 100 years and that his results and conclusions were peer-reviewed by a second examiner. It noted that Webb conceded, however, that there was no established conclusive error rate despite the 2014 Ames I study's findings.

¶ 45    At trial, Alvarado-Vasquez again objected to the reliability of Webb's testimony regarding toolmark identification and requested the court limit the testimony as was done by the court in *Abruquah v. State*, 296 A.3d 961, 969 (Md. 2023) (limiting the firearm expert's testimony to the AFTE categories of conclusiveness and prohibiting testimony about the suspect's weapon matching a certain bullet or casing striations to any level of practical, ballistic, or scientific certainty).

¶ 46    Alvarado-Vasquez explained that *Abruquah*, published after the *Shreck* hearing, extensively analyzed and addressed the studies and related arguments both parties had presented and concluded that firearm and toolmark analysis could not reliably "support an unqualified conclusion that such bullets were fired from a

particular firearm." *Id.* at 968. He continued that the *Abruquah* court noted the 2014 Ames I study and a second Ames study found that if inconclusive results were factored into the purported error rate, the error rates would jump to thirty percent and forty-four to fifty-three percent, respectively. Likewise, Alvarado-Vasquez said the *Abruquah* court found that a peer review process similar to the one Webb outlined was subject to confirmation bias because the second examiner "know[s] what the results of the first examiner were." He noted the two Ames studies were also not peer reviewed or published in a journal, and the *Abruquah* court also found that there was no evidence of general acceptance of AFTE's methods outside of firearms examiners or law enforcement officials.

¶ 47 However, the trial court declined to limit Webb's testimony, explaining that although *Abruquah*'s majority opinion was persuasive, the defense was free to cross-examine Webb to better highlight the purported unreliability of his methods and conclusions. The court reasoned that the *Abruquah* decision was not unanimous, and its two dissents were highly critical of the majority's holding that the trial court had erred, given that the standard of review was abuse of discretion. *Id.* at 998 (Hotten, J.,

24

dissenting); *id.* at 1005 (Gould, J, dissenting).  The court remarked that it found the dissents' take on the evidence well-reasoned when one criticized the majority for engaging in an "extensive statistical investigation," *id.* at 1031 (Gould, J., dissenting), and the other characterized the expert's testimony rather as an expert opinion to be weighted, *id.* at 1002-05 (Hotten, J., dissenting).

¶ 48    Alvarado-Vasquez's reiterates these arguments on appeal.[4]

### B.    Applicable Law and Standard of Review

¶ 49    CRE 702 governs the admission of expert testimony.  *People v. Glasser*, 293 P.3d 68, 78 (Colo. App. 2011).  Exercising its gatekeeping function when deciding whether to admit expert evidence, a trial court must "focus on the reliability and relevance of the proffered evidence" and determine "(1) the reliability of the scientific principles, (2) the qualifications of the witness, . . . (3) the

---

[4] Alvarado-Vasquez also contends that his due process rights were violated when "scientifically unreliable" testimony was admitted. However, because we find the trial court did not abuse its discretion in admitting Webb's testimony, we do not reach his due process argument. *See People v. Genrich*, 2019 COA 132M, ¶ 136, 471 P.3d 1102, 1122 (Berger, J., specially concurring) (Colorado appellate courts have not previously considered whether the admission of scientifically unreliable expert testimony results in a due process violation).

usefulness of the testimony to the jury," and (4) whether the evidence meets the test of CRE 403. *Shreck*, 22 P.3d at 70. A trial court should apply a liberal standard that only requires proof that the underlying scientific principles are reasonably reliable. *Id.* at 77. Determining if expert testimony is reasonably reliable requires consideration of the totality of the circumstances surrounding the proposed expert testimony and is not contingent on any specific factors. *Id.* at 77-78. Therefore, certain factors — such as whether the technique has been tested, whether it has been subjected to peer review and publication, whether it has been generally accepted, its known or potential rate of error, and the existence and maintenance of standards controlling its operation — will be crucial in some cases but inapposite in others. *Kutzly v. People*, 2019 CO 55, ¶ 12, 442 P.3d 838, 841-42 (referencing factors listed in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)). The court may also consider the expert's experience-based specialized knowledge, as well as other factors. *Shreck* 22 P.3d at 77.

¶ 50    We review a trial court's evidentiary rulings — such as rulings on admission of expert testimony — for an abuse of discretion.

*People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on misapprehending or misapplying the law. *People v. Kendrick*, 2017 CO 82, ¶ 36, 396 P.3d 1124, 1130.

## C.    Analysis

¶ 51    The crux of the defense's argument mirrors the arguments presented in *Abruquah v. State*, which a recent division of this court specifically distinguished. *People v. Rodriguez-Ortiz*, 2025 COA 61, ¶¶ 57-61, ___ P.3d ___, ___. Alvarado-Vasquez also further supplements his argument by citing another case announced after briefing, which held firearms toolmark analysis is not "scientifically valid." *State v. Adams*, ___ P.3d ___, ___, 2025 WL 1553642, at *23 (Or. Ct. App. May 29, 2025).

¶ 52    While we acknowledge that throughout the country firearms toolmark analysis is undergoing renewed scrutiny, *e.g.*, *United States v. Ashburn*, 88 F. Supp. 3d 239, 249 (E.D.N.Y. 2015); *United States v. Taylor*, 663 F. Supp. 2d 1170, 1180 (D.N.M. 2009); *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008); *United States*

27

*v. Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006), we find no abuse of discretion here.

¶ 53     Colorado's evidentiary standards for admitting expert testimony differ from those applied by the courts in *Abruquah* and *Adams*. As the *Rodriguez-Ortiz* division noted, the *Abruquah* court's standard mandates the application of *Daubert* factors while Colorado's standard permits but does not require consideration of those factors. *Rodriguez-Ortiz*, ¶ 59, ___ P.3d at ___. Similarly, the parties in *Adams* stipulated that firearms toolmark analysis was "scientific evidence," and therefore, the *Adams* court had to determine if the evidence was "based on scientifically valid principles" when performing its gatekeeping function. *Adams*, ___ P.3d at ___, 2025 WL 1553642, at *2; *State v. O'Key*, 899 P.2d 663, 673 (Or. 1995) ("[T]rial courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid.").

¶ 54     To determine if expert testimony is reliable in Colorado, trial courts must look at the totality of the circumstances. *Shreck*, 22 P.3d at 77. This inquiry makes no distinction between an inquiry

into the validity of the evidence and one into its reliability. It further makes no distinction between an inquiry into reliability as used in the scientific community to mean repeatability and one into reliability as a layman might use it to mean trustworthiness. *See* Merriam-Webster Dictionary, https://perma.cc/Z4EC-5CZL (defining "reliable"); *see also Shreck*, 22 P.3d at 73-79 (discussing the merits of different evidentiary tests and concluding courts should apply a totality of the circumstances inquiry). Rather, it leaves the inquiry to the broad discretion of the trial court, which may be deployed multiple ways, including in a manner similar to that highlighted in *Abruquah*'s first dissent. *Abruquah*, 296 A.3d at 1000 (Hotten, J., dissenting) ("[T]rial judges are *not* required to make a determination of the ultimate scientific validity of any scientific propositions" but instead, absent scientific training, they are tasked with ensuring that "*sufficient indicia of legitimacy exist.*" (quoting *Rochkind v. Stevenson*, 236 A.3d 630, 649 (Md. 2020))).

¶ 55 Here, in part, Webb based his opinion on his training and experience, which alone can substantiate admission. *Brooks v. People*, 975 P.2d 1105, 1106 (Colo. 1999) (holding scent-tracking evidence was experience-based specialized knowledge that was not

29

dependent on scientific explanation and determining the evidence was admissible).  Further, as highlighted by the *Rodriguez-Ortiz* division, Webb's testimony based on firearms toolmark analysis satisfies many of the *Daubert* factors.  *Rodriguez-Ortiz,* ¶ 63, ___ P.3d at ___ (listing cases that hold firearms toolmark analysis has been meaningfully tested, subject to peer review and publication, has an error rate, and has been generally accepted in the scientific community).

¶ 56    Moreover, in contrast with the testimony by the expert in *Abruquah,* Webb's testimony was subject to numerous caveats.  *Id.* at ¶ 60, ___ P.3d at ___.  Webb explained that any conclusions that a firearm and a bullet matched were ultimately determinations that experts decided based on their training and experience, and that each expert could have a different understanding of what constituted a sufficient match.

¶ 57    He admitted that his conclusions were not subject to peer review and that his methods could not determine who had handled the weapon at the time of the alleged crime.  These caveats were, in fact, elicited at trial during cross-examination, which is precisely the way the *Schreck* court envisioned handling concerns about

invalid scientific assertions. *Est. of Ford v. Eicher*, 250 P.3d 262, 269 (Colo. 2011) (referencing *Shreck*, 22 P.3d at 78, and explaining that testability and error rate concerns that implicate the reliability of the evidence go to the weight of expert testimony, which are matters that can be adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof).

¶ 58     We also distinguish this case from *People v. Genrich*, 2019 COA 132M, ¶ 31, 471 P.3d 1102, 1107 (*Genrich II*).[5]  There, the defendant was convicted of multiple felonies, including two counts of first degree murder, arising from a series of pipe bomb detonations in 1991.  *Id.* at ¶ 5, 471 P.3d at 1104.  In his direct appeal of the denial of his Crim. P. 35(c) petition, Genrich argued he was entitled to an evidentiary hearing because his conviction was based largely on toolmark analysis whose reliability had been discredited by the studies discussed above.  *Id.* at ¶¶ 1, 31-32, 471 P.3d at 1104, 1107-08.  He explained that new evidence from the

---

[5] We match the naming references that *People v. Genrich*, 2019 COA 132M, 471 P.3d 1102, set by identifying *People v. Genrich*, 928 P.2d 799 (Colo. App. 1996), as *Genrich I*.

2009 NAS report, as well as its author's expert testimony, called into question if "the exclusive sourcing of a tool mark to one particular tool" was ever justified. *Id.* at ¶ 32, 471 P.3d at 1108. The *Genrich II* court agreed that Genrich was entitled to an evidentiary hearing and remanded the case to determine if the admission of contrary expert testimony warranted a new trial. *Id.* at ¶ 64, 471 P.3d at 1113. On remand, after multiple experts testified for and against the reliability of toolmark analysis, Genrich was granted a new trial, and that decision was affirmed on appeal. *See People v. Genrich*, 2025 COA 49, ¶¶ 35-38, 58, ___ P.3d ___, ___ (*Genrich III*).

¶ 59     The facts in *Genrich II* and *III* ultimately distinguish it if from this case. First, the issue in the *Genrich* cases was the reliability of an expert's unqualified opinion regarding identification of marks on a wire allegedly made by a hand tool. *Genrich II*, ¶¶ 21-23, 31, 471 P.3d at 1106-07. In contrast, this case involves an analysis of marks left by a firearm on cartridge casings. The concurrence in *Genrich II* explained that "[t]he analysis of toolmarks left on a surface by a hand tool is inherently more subjective than the analysis of toolmarks left by a gun on bullets or cartridge casings"

32

and therefore "[o]pinions from other jurisdictions concluding that firearms identification testimony is admissible bear little weight here because of the differences between toolmark identification analysis for firearms and hand tools." *Id.* at ¶ 125, 471 P.3d at 1120-21 (Berger, J., specially concurring). The facts of *Genrich III*, which dealt with the government's appeal of the postconviction court's order of a new trial after the remanded evidentiary hearing, further buttress this distinction. *Genrich III*, ¶ 38, ___ P.3d at ___ (explaining experts opined hand-held toolmark analysis introduced far more variables in the matching process and thus had a far less statistical probability of identifying a correct match than firearms toolmark analysis).

¶ 60    Second, during Genrich's initial trial in 1991, the defense counsel did not cross-examine the expert on the reliability of his hand tool analysis methods or conclusions — presumably because counsel lacked the 2009 NAS report, which was not issued until eight years later. *Genrich II*, ¶ 28, 471 P. 3d at 1107. The lack of cross-examination highlighting this conflicting evidence denied the jury the opportunity to adequately weigh the reliability of the expert's testimony. In contrast, here, Alvarado-Vasquez not only

33

had the benefit of the 2009 NAS report during his trial, as well as other reports, but his defense counsel also used these reports' findings to guide their cross-examination of Webb.

¶ 61 Thus, given that there were still adequate legal and factual grounds before it, we conclude the trial court did not abuse its discretion when it admitted the testimony and let the jury determine the appropriate weight to give Webb's conclusion that the gun found in the duffel bag was the same as the one used at the alleged crime scenes.

## V. Jury Instructions

¶ 62 Finaly, Alvarado-Vasquez alleges the court erred when it denied his request to tender implicit bias instructions to the jury. We are not persuaded.

### A. Additional Facts

¶ 63 Alvarado-Vasquez is a Spanish speaker and an El Salvadoran national without legal status accused of being an MS-13 gang leader who participated in violent crimes. Citing the political climate during the 2023 trial, Alvarado-Vasquez requested the court tender the following instructions (or similar instructions) regarding

implicit bias, taken from the U.S. District Court for the Western District of Washington.[6]

> It is important that you discharge your duties without discrimination, meaning that bias regarding race, color, religious beliefs, national origin, sexual orientation, gender identity, or gender of the [plaintiff,] defendant, any witnesses, and the lawyers should play no part in the exercise of your judgment throughout the trial. Accordingly, during this voir dire and selection process, I [the lawyers] may ask questions [or use demonstrative aids] related to the issues of bias and unconscious bias.

¶ 64 The court refused to give the tendered instructions. After Alvarado-Vasquez was convicted, the Colorado Supreme Court's Model Criminal Jury Instruction (COLJI) Committee amended its model instructions to add language regarding unconscious bias. COLJI-Crim. B:01 n.11 (2024).[7]

---

[6] Alvarado-Vasquez also made other requests to the court regarding implicit bias questioning during voir dire and education that were also denied. However, he does not appeal these decisions.

[7] After these briefings were before this court, the Colorado Supreme Court adopted a rule change to Crim. P. 24(d), which addressed when prospective jurors were preemptively challenged for implicit bias, outlined procedures the trial court must undergo, and listed certain factors it may consider when making its decision. The rule is "simply intended to provide further guidance" and is not effective until January 2, 2026. Rule Change 2025(15), Colorado Rules of Criminal Procedure (Amended and Adopted by the Court En Banc, June 26, 2025), https://perma.cc/PEB5-DQ89.

B.     Applicable Law and Standard of Review

¶ 65     We review jury instructions de novo to determine whether, as a whole, they accurately informed the jury of the governing law. *Riley v. People*, 266 P.3d 1089, 1092-93 (Colo. 2011).  If the jury instructions properly inform the jury of the law, the trial court has "broad discretion to determine the form and style of jury instructions."  *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). Accordingly, we review a trial court's decision concerning a proposed jury instruction for an abuse of discretion and will not disturb the ruling unless it is manifestly arbitrary, unreasonable, or unfair.  *Id.*

¶ 66     When a defendant objects to the trial court's ruling on a jury instruction, we review for nonconstitutional harmless error and will affirm if "there is not a reasonable probability that the error contributed to the defendant's conviction."  *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001) (quoting *Salcedo v. People*, 999 P.2d 833, 841 (Colo. 2000)).

C.     Analysis

¶ 67     Alvarado-Vasquez acknowledges that, shortly after he was convicted, a division of this court also affirmed a court's refusal to

give an implicit bias instruction. *People v. Toro-Ospina*, 2023 COA 45, ¶ 47, 535 P.3d 132, 141-42 (finding no abuse of discretion when no statute or case required the court to tender an implicit bias jury instruction). Alvarado-Vasquez invites us to depart from this decision because of the COLJI's new implicit bias instruction. We decline the invitation.

¶ 68 Courts are not bound by model instructions because they are not law and not authoritative. *People v. Salazar*, 2023 COA 102, ¶ 22, 542 P.3d 1209, 1217. Therefore, the new COLJI instruction is not a mandate, and the trial court would not have been required to use it if it had been in effect at the time of trial.

¶ 69 Likewise, the record supports the conclusion that the court did not abuse its discretion. The prosecution did not bring up Alvarado-Vasquez's immigration status, nor was he the only Spanish speaker at trial because many of the witnesses called by the People also only spoke Spanish. The court also provided a reasoned explanation about its decision to deny the proffered instruction. It noted that in nearby counties, Spanish-speaking populations were the majority-minority, and it had not encountered repeated instances of implicit bias. In lieu of the proffered

instructions, it agreed to give the jurors an instruction "that talk[s] about sympathy, bias, and prejudice not having a place in the courtroom" and noted that the attorneys were free to explore the bias issue during voir dire.

¶ 70 While Alvarado-Vasquez now points us to several persuasive authorities discussing the "uniquely difficult to identify" nature of implicit bias, *State v. Berhe*, 444 P.3d 1172, 1178 (Wash. 2019), the court used this rationale for its denial. The court said that it found implicit bias to be a concept that was "not easy to understand" and "not easy to identify," and that providing the sort of instruction it did can "scare the jurors into talking about how they really feel." In its experience, jurors were "not shy to disclose their views and their biases" when an implicit bias instruction was lacking. Given these reasons, we conclude the trial court did not abuse its discretion in declining to give an implicit bias instruction.

## VI.   Disposition

¶ 71 We affirm Alvarado-Vasquez's judgment of conviction.

JUDGE WELLING and JUDGE BERGER concur.